POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON SNEED JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACELRX PHARMACEUTICALS, INC., VINCENT J. ANGOTTI, and RAFFI ASADORIAN,<br><br>Defendants. | Case No. 5:21-cv-04353<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Beth Labson Freeman<br><br>Hon. Susan van Keulen<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Yaacov Musry and Aaron Sneed Jr., along with additional named Plaintiff David O'Grady (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AcelRx Pharmaceuticals, Inc.

1

("AcelRx" or the "Company"), analysts' reports and advisories about the Company, interviews with knowledgeable former employees of AcelRx, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AcelRx securities between March 20, 2019 and February 12, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officers.

2.     AcelRx is a specialty pharmaceutical company that focuses on the development and commercialization of therapies for the treatment of acute pain.

3.     During the Class Period, the unprofitable Company's lead product candidate was DSUVIA, a 30 mcg sufentanil sublingual tablet for the treatment of moderate-to-severe acute pain.

4.     On November 2, 2018, AcelRx announced that the U.S. Food and Drug Administration ("FDA") had approved DSUVIA for the management of acute pain in adults severe enough to require an opioid analgesic in certified medically supervised healthcare settings, such as hospitals, surgical centers, and emergency departments.

5.     Because of the potential for life-threatening respiratory depression (reduced or stopped breathing) due to accidental exposure, DSUVIA, an inherently high-risk opioid, is available only through a restricted program called the DSUVIA REMS (Risk Evaluation and Mitigation Strategy) program.

6.     Having had their New Drug Application for DSUVIA rejected once in 2017, and by virtue of its restricted distribution, itself an ongoing topic of discussion with regulators, Defendants were aware at all relevant times of the scrutiny that the FDA would apply to

DSUVIA, as well as the ultimate responsibility that the Company bore for compliance with the DSUVIA REMS.

7.    As an FDA approved drug, DSUVIA is subject to the Federal Food, Drug, and Cosmetic Act ("FD&C Act"). The FD&C Act prohibits introducing or delivering for introduction into interstate commerce any misbranded drug.

8.    Nevertheless, unbeknownst to investors, Defendants placed all responsibility for advertising DSUVIA – its flagship drug and sole commercialized product – on a marketing department consisting of precisely two employees, one of whom had no involvement whatsoever with the promotional materials that would later draw the FDA's ire and cause significant investor losses.

9.    The risk of adverse regulatory action was compounded when the single employee charged with marketing DSUVIA outsourced the job to a third-party vendor, which failed to confirm that the promotional materials for DSUVIA adhered to the REMS or FDA regulations more generally.

10.    Thus, in direct contravention of the FD&C Act, the Company developed and used a banner[1] advertisement and a tabletop display advertisement as promotional materials that were materially false and/or misleading and that misbranded DSUVIA. The promotional materials gave greater status to the benefits of DSUVIA while relegating information regarding limitations of use and risks to significantly less prominent locations and employing typographical and layout techniques less apt to achieve emphasis of the limitations of use and risks of DSUVIA (the "Misbranding Violations").

11.    AcelRx falsely marketed DSUVIA in these advertisements as a one-step drug when it was not, accompanied by the misleading slogan "TONGUE AND DONE," which refers to DSUVIA's sublingual administration—*i.e.*, a tablet of DSUVIA is placed beneath the tongue to dissolve.

---

[1] For purposes of this Amended Complaint, the term "banner" refers to an online advertisement.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

12.     Marketing materials also touted that patients may retake the drug in one-hour intervals, a statement that omitted extremely important maximum dosage safety limitations in the label approved by the FDA.

13.     Through these false and misleading advertisements, Defendants engaged in a scheme to illegally market DSUVIA beyond its permitted label.

14.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, in addition to falsely indicating to investors through the Misbranding Violations that DSUVIA had broader application (and thus greater financial viability) than the label permitted, Defendants made false and/or misleading statements and/or failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions. As a result, the Company's public statements were materially false and misleading throughout the Class Period.

15.     On February 16, 2021, AcelRx disclosed that, on February 11, 2021, the Company received a warning letter from the FDA concerning promotional claims for DSUVIA. Specifically, having "reviewed an 'SDS Banner Ad' (banner) (PM-US-DSV-0018) and a tabletop display (PM-US-DSV-0049) (display)," the FDA concluded that "[t]he promotional communications, the banner and display, make false or misleading claims and representations about the risks and efficacy of DSUVIA," and "[t]hus . . . misbrand Dsuvia within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and make its distribution violative." The warning letter "request[ed] that AcelRx cease any violations of the FD&C Act" and "submit a written response to th[e] letter within 15 days from the date of receipt …."

16.     The FDA's warning letter was especially damning because it located the significance of Defendants' violation in their undermining of the DSUVIA REMS, a plan that had been revised and resubmitted no less than four times by Defendants themselves.

17.     Defendants have never explained the temporal gap between the timing of their receipt of the FDA warning letter on February 11, 2021 and their disclosure of that letter on February 16, 2021.

18.     On this news, AcelRx's stock price fell $0.21 per share, or 8.37%, to close at $2.30 per share on February 16, 2021.  Prior to the Company's February 16, 2021 disclosure, the AcelRx executives named as Defendants herein sold shares for a profit of more than $100,000, all while in possession of material, non-public information.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  AcelRx is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

24.     Plaintiffs, as set forth in Certifications previously filed with the Court (ECF Nos. 21-2 & 28-5) acquired AcelRx securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

25.     Defendant AcelRx is a Delaware corporation with principal executive offices located at 25821 Industrial Boulevard, Suite 400, Hayward, California 94545.  The Company's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ACRX."

26.     Defendant Vincent J. Angotti ("Angotti") has served as AcelRx's Chief Executive Officer ("CEO") at all relevant times. On February 11, 2021, the same day that AcelRx received the FDA's warning letter, but prior to the disclosure of the FDA warning letter on February 16, 2021, Defendant Angotti sold 23,052 shares of AcelRx stock at $2.63 per share, for a total of $60,626.76.

27.     Defendant Raffi Asadorian ("Asadorian") served as AcelRx's Chief Financial Officer ("CFO") at all relevant times. On February 11, 2021, the same day that AcelRx received the FDA's warning letter, but prior to the disclosure of the FDA warning letter on February 16, 2021, Defendant Asadorian sold 9,024 shares of AcelRx stock at $2.63 per share, for a total of $23,733.12.

28.     Defendant Pamela Palmer ("Palmer"), is an anesthesiologist and served as AcelRx's Chief Medical Officer ("CMO") at all relevant times. On February 11, 2021, the same day that AcelRx received the FDA's warning letter, but prior to the disclosure of the FDA warning letter on February 16, 2021, Defendant Palmer sold 8,915 shares of AcelRx stock at $2.63 per share, for a total of $23,446.45.

29.     Defendants Angotti, Asadorian, and Palmer are sometimes referred to herein as the "Individual Defendants."

30.     The Individual Defendants possessed the power and authority to control the contents of AcelRx's SEC filings, press releases, and other market communications. The Individual Defendants were privy to the Company's communications with the FDA, and were provided with copies of AcelRx's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with AcelRx, and their access to material information available to them but not to the public, the Individual Defendants knew that

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

31.     AcelRx and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### AcelRx and DSUVIA

32.     AcelRx is a specialty pharmaceutical company that purports to focus on the development and commercialization of therapies for the treatment of acute pain. The Company's lead product candidate is DSUVIA, a 30 mcg sufentanil sublingual tablet for the treatment of moderate-to-severe acute pain. The Company only has two other products in its portfolio in addition to DSUVIA.

33.     DSUVIA – which was developed in collaboration with the Department of Defense with an eye toward military use – is a potent opioid painkiller that is of particular use in certain special circumstances where adult patients may not be able to swallow oral medication and where access to intravenous pain relief is not possible.

34.     On December 12, 2016, AcelRx submitted to the FDA a New Drug Application (or "NDA") for DSUVIA which included a proposed Risk Evaluation and Mitigation Strategy (or "REMS").

35.     REMS refers to "a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks."[2] Specifically, "REMS are designed to reinforce medication use behaviors and actions that support the safe use of that medication.

---

[2] See Risk Evaluation and Mitigation Strategies | REMS, https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems (last accessed Mar. 7, 2022).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

While all medications have labeling that informs health care stakeholders about medication risks, only a few medications require a REMS."[3]

36.    While the FDA specifies the requirements and approves the REMS, the drug manufacturer is responsible for developing and implementing the program.

37.    AcelRx's decision to include a REMS in its NDA demonstrated its actual knowledge of the serious risks associated with DSUVIA, and the need to limit distribution to certified, medically-supervised health care settings where health care professionals are trained in the proper use and administration of the product. Such settings include hospitals, surgical centers, and emergency departments that are certified consistent with the requirements outlined in the REMS.

38.    In the case of DSUVIA, the initially proposed REMS consists of a Medication Guide, ETASU ["Elements to Assure Safe Use"], an implementation system, and a timetable for submission of assessments.

39.    On July 27, 2017, a REMS Oversight Committee ("ROC") meeting was convened to discuss the REMS proposal for DSUVIA, during which the ROC agreed that a REMS with ETASU was necessary "to ensure the benefits outweigh the risks associated with Dusvia use."

40.    A memorandum by the FDA's Division of Risk Management, dated September 21, 2017, highlighted the importance of DSUVIA's presentation: "[t]he proposed indication for Dsuvia is for use in a medically supervised setting and the proposed labeling contains a boxed warning to discontinue the use of Dsuvia prior to discharge and warning for the risk of addiction, abuse, and misuse."

41.    On October 11, 2017, the FDA sent AcelRx a Complete Response Letter (or "CRL") rejecting the DSUVIA NDA. The CRL found fault with, among other things,  the

_____

[3] *Id.*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

directions for use included in the proposed label submitted as part of the NDA. Once again, the significance of DSUVIA's presentation was communicated directly to AcelRx.

42.     On May 3, 2018, AcelRx resubmitted NDA 209128 for DSUVIA, which again included a proposed, updated REMS.

43.     A September 12, 2018 FDA memorandum presenting an overview of the Anesthetic and Analgesic Drug Products Advisory Committee's meeting to discuss the resubmitted DSUVIA NDA mentions that AcelRx "modified the directions for use" of DSUVIA in order to address the concerns itemized in the October 11, 2017 CRL.

44.     On October 9, 2018, the FDA and AcelRx representatives met via teleconference to discuss the REMS.

45.     An FDA Advisory Committee Briefing Document dated October 12, 2018 explained that the Company would bear ultimate responsibility for ensuring compliance with the REMS for DSUVIA:

> ***AcelRx will be responsible for monitoring and auditing the entire DSUVIA supply chain from point of packaging through use by the certified healthcare facilities/services to ensure that all processes and procedures are in place and functioning to support the requirements of the DSUVIA REMS Program***. If non-compliance or DSUVIA use outside of a medically supervised setting is identified, corrective action, including immediate de-certification, will be instituted by AcelRx. (Emphasis added.)

46.     On October 17, 2018, the FDA provided preliminary comments to AcelRx concerning the REMS Document and REMS materials (Healthcare Setting Enrollment form and Website Screenshots) for DSUVIA.

47.     On October 23, 2018, AcelRX submitted to the FDA an amended REMS that included comments on its REMS document, enrollment form and website screenshots.

48.     On October 29, 2018, the FDA provided AcelRx with feedback on, among other things, the website screenshots.

49.     On October 31, 2018, AcelRx submitted to the FDA a further amended REMS that included the proposed revised REMS Document, enrollment form, and website screenshot.

50.     In the run-up to DSUVIA's approval decision, on October 31, 2018, Dr. Pamela Palmer ("Palmer"), anesthesiologist and chief medical officer at AcelRx, argued that DSUVIA addressed an unmet need: "[r]ight now, if you broke your femur and went into an emergency room, you would either have to be stuck with a needle or they would just give you an oral pill that you would swallow and kind of wait for it to kick in, which could take up to an hour."

51.     On November 1, 2018, AcelRx submitted yet another amended REMS.

52.     In contrast to other comparatively slow-acting opioids, said Palmer, DSUVIA could dissolve under the tongue for patients, which she claimed offered a unique benefit previously restricted to cancer patients.

53.     The danger of DSUVIA was obvious to Defendants and medical professionals, as it is five to ten times stronger than fentanyl and 500 to 1000 times more powerful than morphine.  Acknowledging the threat to safety, Palmer assured the public that "[w]e have much stricter audits and monitoring and controls where we will have oversight from our manufacturers, from our distributors, wholesalers, all the way to the medically supervised setting"; in short, AcelRX described DSUVIA's rollout as heavily supervised because of its inherent danger.

54.     On November 2, 2018, AcelRx announced that the FDA had approved DSUVIA (with the fifth REMS submitted on November 1, 2018) for the management of acute pain in adults severe enough to require an opioid analgesic in certified medically supervised healthcare settings, such as hospitals, surgical centers, and emergency departments.

55.     Despite the addition of a heavily negotiated REMS to address safety concerns, industry participants criticized the FDA for approving DSUVIA because of its risk profile, further putting the Company on notice that its flagship drug would be subject to opposition and scrutiny.

56.     Sidney Wolfe, founder and senior adviser of Public Citizen's Health Research Group, warned, on November 2, 2018, that "[i]t is likely, if not certain, that Dsuvia will be

banned after 'enough' such deaths occur and the inevitable House oversight hearings are held investigating why the FDA approved this opioid with no unique benefit but unique harms . . . ."

57.     On November 5, 2018, Senator Ed Markey (D-Massachusetts) added that "[e]ven in the midst of the worst drug crisis our nation has ever seen, the FDA once again is going out of its way to approve a new super-charged painkiller that would only worsen the opioid epidemic. It makes no sense to approve an opioid painkiller that has no benefits over similar medications and against the advice of experts."

58.     Raeford Brown, M.D., the FDA's opioid advisory committee chair, warned against the approval.  And, after the agency green-lit DSUVIA, Dr. Brown co-authored a November 16, 2018 column in *The Washington Post* saying the FDA made "made the wrong call." Along with the drug's inherent dangers, DSUVIA had "limited efficacy and no unique benefits," to recommend it, according to Dr. Brown.

59.     Around the same time, Senator Richard Blumenthal (D-Connecticut), appeared at a press conference with fire fighters and police officers, and warned that DSUVIA would inevitably move to street consumption, thereby worsening the national epidemic of opioid addiction.

60.     Well known problems with other opioid manufacturers also put Defendants on notice that DSUVIA's marketing would be heavily scrutinized.  For example, in 2019, at the same time the Company was engaged in DSUVIA-related misbranding violations, an Insys Therapeutics executive danced and rapped in a fentanyl spray bottle at a national sales conference, garnering widespread criticism.

61.     Nevertheless, enforcement actions by the FDA's  Office of Prescription Drug Promotion ("OPDP") have remained low in recent years, with only six warning and untitled letters sent to drugmakers in 2020. Since 2015, OPDP has sent fewer than ten untitled and warning letters in all but two years, 2019 and 2016.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Defendants Short-staff and Outsource AcelRx's Branding Operation for DSUVIA**

**FE1**

62.   Former Employee ("FE") 1, worked as a contract marketing manager for AcelRx from June 2017 to March 2020 and as a marketing specialist from January 2016 to June 2017.

63.   FE1's supervisor was Senior Director, Marketing Christopher Dillard ("Dillard"), who reported directly to Defendant Angotti, who has a background in marketing and was involved in setting the commercialization strategy for DSUVIA.

64.   FE1 confirmed that ACELRx had only had one commercialized product at the time FE1 worked there, and everyone at the Company worked on it.

65.   FE1 managed agency and vendor relationships for AcelRx and developed content marketing materials, including brochures, training materials, videos, presentations, and websites. She conducted primary and secondary market research projects to help AcelRx adapt its DSUVIA marketing strategy before and after the launch.

66.   In addition, FE1 assessed the market landscape and reviewed the packaging design.

67.   FE1 said that DSUVIA's brand identity required regular sign-off from regulatory and compliance staff, because it required a REMS.

68.   FE1 stated that Marketing collaborated with the medical, legal, and regulatory ("MLR") departments via a Promotional Review Committee ("PRC") a multi-disciplinary group which included representatives from MLR. PRC members approved marketing content as FDA compliant and were in direct communication with the FDA.

69.   FE1 managed all inputs and commercial needs for the MLR meeting of the PRC, and was responsible for coordinating the group.

70.   FE1 assessed demand for DSUVIA and worked closely with the sales team on the launch strategy and execution for DSUVIA.

71.   FE1 ensured that the sales reps and conference booth staff had needed marketing materials and worked closely with the trade show manager to develop strategy, manage vendors, and run pre-conference meetings.

72.     FE1 related that AcelRx did not come up with the slogan "tongue and done" for DSUVIA in-house. Instead, AcelRx's two-person marketing team – FE1 and Dillard – enlisted outside agencies to create the DSUVIA launch campaign content.

73.     Even though FEI was one of only two people at AcelRx corporate headquarters who worked on marketing during a period in which the banner ad and/or the tabletop display which were the subject of the FDA warning letter were generated and disseminated, FE1 did not recall either the banner ad or the tabletop display in question.

**FE2**

74.     FE2 served as a contract HR Consultant at AcelRx Pharmaceuticals, Inc. from June 2019 to August 2021. FE2 was based in Redwood City, California, and reported to management at Christine Mathews Consulting, where FE2 was a people operations/human resources coordinator and part of the consulting team.

75.     As a contract HR Consultant for AcelRx, FE2 worked for the company during the launch of DSUVIA, helping as an outside consultant on staffing matters. There were multiple people in this role.

76.     FE2 explained that AcelRx was a small company, and only two people at corporate headquarters worked on marketing. Senior Director, Marketing Christopher Dillard, was responsible for all marketing functions, and he had one direct report – FE1.

77.     FE2 understood that Dillard reported to the CEO, Defendant Angotti, who has a background in sales and marketing.  Consistent with FE2's understanding, Defendant Angotti describes his former experience on LinkedIn as including a seven-year stint as Senior Vice President, Sales and Marketing at Reliant Pharmaceuticals from 2001-2008, and describes his education as including a Master of Business Administration in Business, Management, Marketing, and Related Support Services from Columbia University.

78.     FE2 stated that Angotti provided final approval and would have reviewed and signed off on marketing materials.

1

**FE3**

2      79.     FE3 served as a medical editor for Publicis Groupe ("Publicis") from March 2018

3    to September 2018. Publicis' Health division worked with AcelRx on the marketing materials

4    for DSUVIA, with Dillard as the primary contact.

5      80.     FE3 confirmed that AcelRx relied on Publicis Groupe's Health division to hone

6    its messaging and brand identity for DSUVIA, including editing in preparation for the FDA.

7      81.     FE3 worked at Publicis as AcelRx was preparing to launch DSUVIA, which was

8    marketed to health care professionals in ambulatory surgical centers and hospitals.

9      82.     To that end, FE3 reviewed direct-to-provider projects, including concepts,

10   collateral, and FDA-facing materials.

11     83.     FE3 stated that in regard to DSUVIA's marketing materials, Publicis – and not

12   AcelRx – claim-checked annotations and references, and ensured adherence to FDA regulations,

13   AMA style, and brand style guidelines.

14     84.     FE3 explained that the "tongue and done" phrase, was designated as "creative

15   messaging" and handled by someone at Publicis other than FE3. The Publicis employee who

16   oversaw "creative messaging," unlike FE3, **had no duty to ensure adherence to FDA**

17   **regulations**. Instead, it was accepted that the FDA would review all marketing materials, which

18   is exactly what happened.

19                        **Defendants' Misbranding Violations**

20     85.     The Federal Food, Drug, and Cosmetic ("FD&C") Act prohibits the introduction

21   into interstate commerce any drug that is "misbranded." 21 U.S.C. § 331(a). Drugs are deemed

22   "misbranded" if they have false or misleading labeling, or if the advertisements for the drug are

23   false or misleading. 21 U.S.C. § 352(a)(1), (n); 21 C.F.R. 202.1(e)(5)(ii).

24     86.     In particular, drug advertisements violate the FD&C Act if they fail to present a

25   fair balance between information relating to risks and harms of the drug and information relating

26   to the effectiveness of the drug. 21 C.F.R. 202.1(e)(5)(ii).

27     87.     By regulation, determining whether drug advertisements are misleading involves

28   examining not only representations made or suggested by statements, words, designs, or any

                                        14

combination thereof, but also the extent to which the advertising fails to reveal facts material in light of such representations or material with respect to the consequences of using the advertised drug under customary and usual conditions of use or under the conditions of use prescribed in advertisements. 21 U.S.C. § 321(n).

88. Starting in 2019, Defendants engaged in the Misbranding Violations by developing and using two promotional materials for DSUVIA, the banner and tabletop display, that made false and misleading claims and representations about the risks and efficacy of DSUVIA.

89. AcelRx disseminated promotional communications that undermined key prescribing conditions required for the safe use of DSUVIA, which was approved with special REMS restrictions. The promotional communications at issue, however, promote the product as simple to administer – just "**Tongue and Done.**" The slogan "***TONGUE AND DONE***," falsely and dangerously implied that the administration of DSUVIA consisted of a simple, one-step process:



**[Figure 1: Tabletop Display]**

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

   

**[Figure 2: Banner Ad]**

90.     As indicated by the product labeling mandated by the FDA as part of its approval, the administration of DSUVIA requires much more than plopping a tablet under the tongue. Specifically, a proper administration of the drug requires an initial, distinct step in which sublingual administration of the DSUVIA tablet is visually confirmed. This additional step is important due to the serious safety concerns to the patient and others that arise from the potency and small size of the DSUVIA tablet.

91.     While AcelRx's banner and tabletop display included safety and risk information regarding DSUVIA, that information was minimized so that it was far less prominently displayed than the misleading statements that falsely touted the simple administration of DSUVIA. For instance, both promotional materials failed to present risk and warning information with prominence and readability reasonably comparable with the presentation of information relating to DSUVIA's benefits,

92.     The banner included additional false and misleading claims about the use of DSUVIA, including the following representations: (1) "Minimum redosing interval 1 hour," and (2) "Average redosing interval **3 hours\*** . . . **\*Shown** over a 12-hour period in the pivotal trial." These claims omitted crucial information concerning DSUVIA's maximum daily dosage. In particular, the drug's FDA- approved label expressly warned: "Do not exceed 12 tablets in 24

16

hours," a potentially life-threatening limitation that was omitted from Defendants' misbranded advertisements.

93.     The banner also claimed that "DSUVIA® comes in one strength for acute pain." This statement makes representations about the medical indication and use of DSUVIA while failing to adequately convey material information regarding the drug's limitations of use, thereby resulting in a misleading impression about the drug.

94.     Additionally, while the banner contained some cautionary language, information regarding DSUVIA's risks was presented in a significantly less prominent fashion than information regarding DSUVIA's purported benefits. Medical indication and risk information were presented in a small font size on a white background and required the viewer to "scroll" down the banner to fully view the information, such as the statement in tiny print that "DSUVIA is for use only in a certified medically supervised healthcare setting." This unbalanced presentation contrasted with the banner's benefit claims, which were presented in a large font on a color background and required no scrolling to view.

95.     The banner and display created a misleading impression about the safe and effective use of DSUVIA, and therefore misbranded the drug and made its distribution a violation under the FD&C Act.

96.     The banner and display were flagrant violations of the DSUVIA REMS, and were especially risky given the FDA's understanding – communicated during the Class Period – that opioid manufacturers sometimes undermine their own REMS in a bid to increase prescriptions for financial gain.

97.     A publicly-disseminated, September 2020 report by the U.S. Department of Health and Human Services ("HHS"), Office of Inspector General noted that the "challenges to ensuring that these REMS mitigate opioid misuse and abuse" included the fact that "[s]ome opioid manufacturers engaged in deceptive marketing practices that undermined the REMS'

1  educational messages regarding risk."[4] Such campaigns were, according to HHS, "designed to
2  increase prescribing."[5]

3  **Materially False and Misleading Statements Issued During the Class Period[6]**

4  98.    The Class Period begins on March 20, 2019, when AcelRx presented at the
5  Oppenheimer Health Care Conference. There, Defendant Angotti described for investors and
6  analysts the addressable opportunity for DSUVIA paraphrasing the same language that
7  ultimately resulted in the FDA warning letter:

> So, with the partnership for about the last nine years with the Department of
> Defense, out of that came DSUVIA, which is a single dose of 30 microgram
> sublingual sufentanil tablet. It is delivered in what's called an SPA. It might look
> like a syringe, but at one end it's actually a blunt tip. It's plastic and clear so you
> can actually see that the pill is in it. It's got a lock at the other end that prevents
> premature actuation or rejection of the pill. **You would simply remove the lock,
> tell the patient in the ER and post-op or the soldier [to] tilt their head back,
> lift up their tongue, you inject it under and you're done. And it's basically as
> simple as that.**

99.    The statements contained in ¶98 were false and/or materially misleading when
made because they failed to disclose that:  (1) "lift up their tongue, you inject it under and you're
done. And it's basically as simple as that" created a misleading impression about the use of
DSUVIA by omitting material information regarding dosing and administration; (2) by omitting
material information regarding DSUVIA's limitations of use, Defendant Angotti created a
misleading impression about the safe use of DSUVIA; (3) AcelRx failed to implement and/or

---

[4] Suzanne Murrin, FDA's RISK EVALUATION AND MITIGATION STRATEGIES: UNCERTAIN
EFFECTIVENESS IN ADDRESSING THE OPIOID CRISIS, U.S. Department of Health and Human
Services, Office of Inspector General, pp. 3, 23 (Sept. 2020).

[5] *Id.*

[6] Emphasis is added throughout, unless otherwise noted

18

maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; and (4) as a result, the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

100.    During the Class Period, Defendants published and disseminated the tabletop and banner advertisements depicted in ¶89, *supra*, which were ultimately the subject of the FDA Warning letter.

101.    The statements contained and/or referred to in ¶¶89 & 100 were false and/or materially misleading when made because they failed to disclose that: (1) "tongue and done" created a misleading impression about the use of DSUVIA by omitting material information regarding dosing and administration; (2) by omitting material information regarding DSUVIA's limitations of use, Defendants created a misleading impression about the safe use of DSUVIA; (3) AcelRx failed to implement and/or maintain sufficient internal controls and procedures regarding the marketing of DSUVIA; and (4) as a result, the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

102.    On May 9, 2019, AcelRx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q stated that **"[t]he success of DSUVIA will depend on numerous factors, including … effective management of and compliance with the DSUVIA Risk Evaluation and Mitigation Strategies, or REMS program; continued demonstration of an acceptable safety profile of DSUVIA following approval."**

103.    The statements contained in ¶102 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx was not "effecive[ly] manag[ing]" compliance with the DSUVIA REMS program, but had instead left responsibility for REMS-compliant marketing with a single employee, who then outsourced that responsibility to a third party (Publicis) which did not even account for FDA compliance in its evaluation of the "Tongue and Done" slogan; (2) DSUVIA was not demonstrating an "acceptable safety profile" given that its marketing gave rise to serious safety risks at odds with the REMS; (3) Defendants were

1    creating a misleading impression about the safe use of DSUVIA; and (4) as a result, the

2    Company was subject to increased risk of regulatory investigations or enforcement actions.

3     104. Appended as exhibits to the 1Q19 10-Q were signed certifications pursuant to the

4    Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that **"[t]he**

5    **[2019 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the**

6    **Exchange Act" and that "[t]he information contained in the [2019 10-K] fairly presents, in**

7    **all material respects, the financial condition and results of operations of the Company."**

8     105. The statements contained in ¶104 were false and/or materially misleading and

9    failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure

10   controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company

11   engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased

12   risk of regulatory investigations or enforcement actions. As a result, the Company's public

13   statements were materially false and misleading at all relevant times.

14    106. On August 6, 2019, AcelRx filed a quarterly report on Form 10-Q with the SEC,

15   reporting the Company's financial and operating results for the quarter ended March 31, 2019

16   (the "2Q19 10-Q"). The 2Q19 10-Q stated that **"[t]he success of DSUVIA will depend on**

17   **numerous factors, including … effective management of and compliance with the DSUVIA**

18   **Risk Evaluation and Mitigation Strategies, or REMS program; continued demonstration**

19   **of an acceptable safety profile of DSUVIA following approval."**

20    107. The statements contained in ¶106 were false and/or materially misleading when

21   made because they failed to disclose that: (1) AcelRx was not "effecive[ly] manag[ing]"

22   compliance with the DSUVIA REMS program, but had instead left responsibility for REMS-

23   compliant marketing with a single employee, who then outsourced that responsibility to a third

24   party (Publicis) which did not even account for FDA compliance in its evaluation of the "Tongue

25   and Done" slogan; (2) DSUVIA was not demonstrating an "acceptable safety profile" given that

26   its marketing gave rise to serious safety risks at odds with the REMS; (3) Defendants were

27   creating a misleading impression about the safe use of DSUVIA; and (4) as a result, the

28   Company was the subject to increased risk of regulatory investigations or enforcement actions.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

108.    Appended as exhibits to the 2Q19 10-Q were substantively the same SOX certifications as referenced in ¶104, *supra*, signed by Individual Defendants Angotti and Asadorian.

109.    The statements contained in ¶108 were false and/or materially misleading when made for the same reasons identified in ¶104.

110.    On November 7, 2019, AcelRx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q stated that **"[t]he success of DSUVIA will depend on numerous factors, including … effective management of and compliance with the DSUVIA Risk Evaluation and Mitigation Strategies, or REMS program; continued demonstration of an acceptable safety profile of DSUVIA following approval."**

111.    The statements contained in ¶110 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx was not "effecive[ly] manag[ing]" compliance with the DSUVIA REMS program, but had instead left responsibility for REMS-compliant marketing with a single employee, who then outsourced that responsibility to a third party (Publicis) which did not even account for FDA compliance in its evaluation of the "Tongue and Done" slogan; (2) DSUVIA was not demonstrating an "acceptable safety profile" given that its marketing gave rise to serious safety risks at odds with the REMS; (3) Defendants were creating a misleading impression about the safe use of DSUVIA; and (4) as a result, the Company was the subject to increased risk of regulatory investigations or enforcement actions.

112.    Appended as exhibits to the 3Q19 10-Q were substantively the same SOX certifications as referenced in ¶104, *supra*, signed by Individual Defendants Angotti and Asadorian.

113.    The statements contained in ¶112 were false and/or materially misleading when made for the same reasons identified in ¶104.

114.    On March 17, 2020, AcelRx filed an annual report on Form 10-K with the SEC, during post-market hours, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K touted the Company's

sales and marketing practices for DSUVIA, representing, inter alia, that Defendants have **"created and deployed a focused scientific support team to gather a detailed understanding of individual emergency room and hospital needs in order to present DSUVIA effectively"**; have **"increased awareness of the clinical profile of sublingual administration of sufentanil through publication of our clinical data"**; have **"engaged appropriate Advisory Boards that include representative emergency room physicians, anesthesiologists, surgeons, nurses, pharmacy and therapeutics, or P&T, committee members and other related experts to provide us with input on appropriate commercial positioning for DSUVIA for each of these key audiences"**; have **"built a sales and marketing organization that can define appropriate segmentation and positioning strategies and tactics for DSUVIA"**; and have **"established DSUVIA on hospital and ambulatory surgery center formularies through deployment of an experienced team to explain the clinical and health economic attributes of DSUVIA."**

115.   The 2019 10-K also represented that Defendants **"may adjust our commercialization plan"** by, among other things, **"continuing to build and progressively deploy a high-quality, customer-focused and experienced sales organization in the United States dedicated to bringing innovative, highly valued healthcare solutions to patients, payers and healthcare providers,"** as needed, and by **"continuing to establish DSUVIA as a suitable choice for moderate-to-severe acute pain in certified medically supervised settings."**

116.   The statements contained in ¶¶114-115 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient internal controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

117.   Additionally, the 2019 10-K touted that Defendants "have carried out an evaluation, under the supervision, and with the participation, of management including our principal executive officer and principal financial officer, of our disclosure controls and procedures . . . as of the end of the period covered by" the 2019 10-K, and that, **"[b]ased on**

**their evaluation, our principal executive officer and principal financial officer concluded that . . . our disclosure controls and procedures were effective as of December 31, 2019.”**

118.    The statements contained in ¶117 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

119.    Appended as exhibits to the 2019 10-K were signed certifications pursuant to the SOX, wherein the Defendants Angotti and Asadorian certified that **“[t]he [2019 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act”** and that **“[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company.”**

120.    The statements contained in ¶119 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

121.    On March 16, 2020, AcelRx held an earnings call for the Fourth Quarter of Fiscal Year 2019 (the “Q4 2019 Earnings Call).  During the Q4 2019 Earnings Call, Defendant  Angotti claimed that the “**DSUVIA launch”** was **“progressing well with our healthcare providers ….”**

122.    The statements contained in ¶121 were false and/or materially misleading when made because they failed to disclose, inter alia, that: (1) The DSUVIA launch was not “progressing well” as an objective matter because its progress relied on illegal, misbranded advertising; and (2) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

123.    On the same call, Defendant Palmer stated that “**AcelRx ensures proper use of DSUVIA via physician education and the DSUVIA risk evaluation and mitigation**

**strategies or REMS program.** DSUVIA is only available to facilities that are part of the DSUVIA REMS program. **Facilities that administer DSUVIA must be able to . . . . ensure the appropriate administration of DSUVIA**. All safety information and the black box warning for DSUVIA can be found at dsuvia.com."

124.    The statements contained in ¶123 were false and/or materially misleading when made because they failed to disclose  that: (1) AcelRx was not ensuring proper use of DSUVIA, mitigating risk, or ensuring the appropriate administration of DSUVIA via promotional materials that created a misleading impression about the use of DSUVIA by omitting material information regarding dosing and administration; (2) Defendants failed to implement and/or maintain sufficient internal controls and procedures regarding the marketing of DSUVIA; (3) as a result, the Company engaged in the Misbranding Violations; and (4) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

125.    On May 11, 2020, AcelRx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q").  The 1Q20 10-Q contained substantively the same statements as referenced in ¶117, *supra*, touting the effectiveness of the Company's disclosure controls and procedures for the period covered by the report.

126.    Appended as exhibits to the 1Q20 10-Q were substantively the same SOX certifications as referenced in ¶119, *supra*, signed by Individual Defendants Angotti and Asadorian.

127.    The statements contained in ¶126 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

128.    On August 10, 2020, AcelRx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "2Q20 10-Q").  The 2Q20 10-Q contained substantively the same statements as referenced in ¶

24

117, *supra*, touting the effectiveness of the Company's disclosure controls and procedures for the period covered by the report.

129. The statements contained in ¶128 were false and/or materially misleading and failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions. As a result, the Company's public statements were materially false and misleading at all relevant times.

130. Appended as exhibits to the 2Q20 10-Q were substantively the same SOX certifications as referenced in ¶119, *supra*, signed by Individual Defendants Angotti and Asadorian.

131. The statements contained in ¶130 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

132. On November 5, 2020, AcelRx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "3Q20 10-Q").  The 3Q20 10-Q contained substantively the same statements as referenced in ¶117, *supra*, touting the effectiveness of the Company's disclosure controls and procedures for the period covered by the report.

133. The statements contained in ¶132 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

134.     Appended as exhibits to the 3Q20 10-Q were substantively the same SOX certifications as referenced in ¶119, *supra*, signed by the Individual Defendants Angotti and Asadorian.

135.     The statements contained in ¶134 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) as a result, the Company engaged in the Misbranding Violations; and (3) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

136.     The 3Q20 10-Q also stated, with respect to "risk factors":

**Summary Risk Factors**

Our business is subject to numerous risks, as more fully described in this section below this summary. You should read these risks before you invest in our common stock. We may be unable, for many reasons, including those that are beyond our control, to implement our business strategy. In particular, our risks include:

● **Guidelines and recommendations published by government agencies, as well as non-governmental organizations, and existing laws and regulations can reduce the use of DSUVIA,** and Zalviso, if approved in the United States.

….

● **If we are unable to maintain or grow our sales and marketing capabilities or enter into agreements with third parties to market and sell our products, we may be unable to generate sufficient product revenue.**

….

● **A key part of our business strategy is to establish collaborative relationships to commercialize and fund development and approval of our products, particularly outside of the United States.** We may not succeed in establishing and maintaining collaborative relationships, which may significantly limit our ability to develop and commercialize our products successfully, if at all.

137.    The statements contained in ¶136 were false and/or materially misleading when made because they failed to disclose that: (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) AcelRx was already in violation of federal laws and regulations with respect to its marketing practices; (3) AcelRx was already risking its ability to commercialize DSUVIA through its then-present course of conduct; (4) the Company engaged in the Misbranding Violations; and (5) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

138.    Defendants further stated that:

**If we are unable to maintain or grow our sales and marketing capabilities or enter into agreements with third parties to market and sell our products, we may be unable to generate sufficient product revenue.***

**In order to commercialize DSUVIA … in the United States, we must maintain or grow internal sales, marketing, distribution, managerial and other capabilities or make arrangements with third parties to perform these services . . . .**

139.    The statements contained in ¶138 were false and/or materially misleading when made because they failed to disclose that:  (1) AcelRx failed to implement and/or maintain sufficient disclosure controls and procedures regarding the marketing of DSUVIA; (2) AcelRx was already in violation of federal laws and regulations with respect to its marketing practices; (3) AcelRx was already risking its ability to commercialize DSUVIA through its then-present course of conduct; (4) the Company engaged in the Misbranding Violations; and (5) the Company was therefore subject to increased risk of regulatory investigations or enforcement actions.

140.    On January 20, 2021, in back of the litany of misrepresentations concerning the DSUVIA launch enumerated above, AcelRx announced plans to sell 14.5 million new shares of Company stock in a transaction expected to generate gross proceeds of around $27.5 million.

27

**The Truth Emerges**

141.     On February 16, 2021, AcelRx filed a current report on Form 8-K with the SEC, disclosing that, on February 11, 2021, AcelRx received a warning letter from the FDA concerning the Misbranding Violations involving DSUVIA.   Specifically, the Form 8-K disclosed, in relevant part:

> On February 11, 2021, AcelRx . . . received a warning letter from the Office of Prescription Drug Promotion ("OPDP") of the [FDA] (the "Letter") relating to a banner advertisement the Company submitted to the OPDP on December 6, 2019 (the "Banner Ad"),  and a tabletop display the Company submitted on February 28, 2020, and resubmitted to the OPDP at its request on September 23, 2020 (the "Tabletop Display," and together with the Banner Ad, the "Promotional Material"). The Company submitted the materials to the OPDP pursuant to the FDA requirement that sponsors submit all promotional materials to the FDA at the time of their initial dissemination or publication. **The FDA's concerns identified in the Letter include its view that the Promotional Material makes misleading claims and representations about the risks and efficacy of DSUVIA® because the Promotional Material does not reveal facts that are material in light of the representations made . . . .**

142.     AcelRx went on to state that "[t]he Company intends to respond to the FDA within the timeframe requested in the Letter and seek guidance and clarification from the FDA on the concerns raised in the Letter." Nevertheless, the nature and impact of any such response remains unknown.

143.     And while AcelRx claimed to have discontinued use of the offending materials, it qualified this by stating that "[t]he Company cannot give any assurances, however, that the FDA will be satisfied with its response to the Letter or that such response will resolve the issues identified in the Letter."

144.     The FDA warning letter, which was also publicly released on February 16, 2021 and which is attached hereto in full as Exhibit 1, advised that the agency "has reviewed an 'SDS

28

Banner Ad' (banner) (PM-US-DSV-0018) and a tabletop display (PM-US-DSV-0049) (display) for DSUVIA (sufentanil) sublingual tablet, CII (Dsuvia) submitted by AcelRx," and that **"[t]he promotional communications, the banner and display, make false or misleading claims and representations about the risks and efficacy of DSUVIA,"** which **"misbrand Dsuvia within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and make its distribution violative."**

145. Specifically, the FDA warning letter noted the following deficiency with respect to the banner and tabletop display at issue: "The banner includes the claim, 'DSUVIA® comes in one strength for acute pain. . . **TONGUE AND DONE.'** (bolded emphasis original; reference omitted) in conjunction with an image of the single-dose applicator device. Similarly, the display prominently includes the claim **'TONGUE AND DONE'** (bolded emphasis original)." The FDA found that **"[t]hese presentations are misleading because they imply that the administration of Dsuvia consists of a simple, one-step process, when this is not the case,"** and that, "[i]n fact, there are numerous administration steps outlined in the PI [the FDA-approved product labeling], including a separate, distinct step to visually confirm tablet placement in the patient's sublingual space of the mouth."

146. The FDA went on to relate its concerns about the banner and tabletop display back to both DSUVIA's serially-amended REMS <u>and</u> the 2017 CRL:

> **The multiple steps involved in the administration of Dsuvia reflect the complexity of use of Dsuvia. Given the potency and the small size of the tablet, the risk of misplaced tablets is a serious safety concern to the patient and others. Risks include overdose and death due to accidental ingestion or exposure, improper dosing (i.e., over- or under-dosing and their associated risks), and the risk of diversion and its associated public health consequences.** This is critical information for healthcare providers to know. Therefore, by oversimplifying the administration process, these presentations create a misleading impression about the safe administration of Dsuvia. **These presentations are particularly concerning considering a REMS program was required for**

**Dsuvia to ensure that the benefits of the drug outweigh the risk of respiratory depression that can result from accidental exposure**.

147.   The FDA warning letter further advised that the banner at issue was deficient for stating "Minimum redosing interval **1 hour**" and "Average redosing interval **3 hours\*…** \*Shown over a 12-hour period in the pivotal trial" (emphases and alteration in original), because they **"create a misleading impression about the use of Dsuvia"** by **"omit[ting] . . . material information from the DOSING AND ADMINISTRATION section of the PI."**  Specifically, the banner should have included the words "Do not exceed 12 tablets in 24 hours" because, **"[b]y omitting this material information about the maximum daily dosage, the banner creates a misleading impression about the safe use of Dsuvia."**  The FDA noted that **"[t]hese omissions are concerning from a public health perspective due to the serious risks associated with overdose with Dsuvia, including respiratory depression and death, that should be considered when prescribing the product."**

148.   Additionally, the FDA warning letter took issue with the banner's claim that "DSUVIA® comes in one strength for acute pain" because **"the banner makes representations about the indication and use of the drug but fails to adequately convey material information regarding Dsuvia's limitations of use, thereby creating a misleading impression about the drug."**

149.   The FDA warning letter also found that, "**unlike the benefit claims in the banner, which utilized a color background and large font, the full indication with the limitations of use are intermingled with risk information in a paragraph format in a much smaller font size and a plain white background**," which were only accessible to viewers by scrolling down the banner and, therefore, did "not mitigate the misleading impression."

150.   The FDA warning letter further noted that the banner and tabletop display at issue "**fail[s] to present information relating to the Boxed Warning, Contraindications, Warnings and Precautions, and Adverse Reactions for Dsuvia with a prominence and readability reasonably comparable with the presentation of information relating to the benefits of Dsuvia**."  The FDA warning letter found that "benefit claims for Dsuvia are

presented in conjunction with colorful graphics and large bolded headlines, with significant white space," whereas "the risk information is relegated farther down in paragraph format with less prominence." The FDA therefore concluded that, "[b]y failing to adequately present the risks and benefits associated with Dsuvia, the banner and display create a misleading impression about the safe and effective use of the drug."

151.    Finally, the FDA warning letter "request[ed] that AcelRx cease any violations of the FD&C Act" and "submit a written response to th[e] letter within 15 days from the date of receipt."

152.    On this news, AcelRx's stock price fell $0.21 per share, or 8.37%, to close at $2.30 per share on February 16, 2021.

153.    An analyst report by Cantor Fitzgerald dated February 16, 2021 acknowledged that the FDA warning letter "is not a complete shock to us, **the FDA has paid significant attention to the instructions for use for Dsuvia, even as far back as 2017**."

154.    Between the time that Defendants admit they first received the FDA warning letter on February 11, 2021 and their disclosure of same to the market on February 16, 2021, 6,973,000 shares of AcelRx traded over two trading days (February 11 and 12) encompassing a value of over $18 million. Defendants have never explained the lag between the timing of their receipt of the letter and their public acknowledgement that they received it.

155.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

156.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AcelRx securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

157.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AcelRx securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AcelRx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

160.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AcelRx;

- whether the Individual Defendants caused AcelRx to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

•      whether the prices of AcelRx securities during the Class Period were artificially

2

inflated because of the Defendants' conduct complained of herein; and

3

•      whether the members of the Class have sustained damages and, if so, what is the

4

proper measure of damages.

5

161.    A class action is superior to all other available methods for the fair and efficient

6

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

7

the damages suffered by individual Class members may be relatively small, the expense and

8

burden of individual litigation make it impossible for members of the Class to individually

9

redress the wrongs done to them.  There will be no difficulty in the management of this action

10

as a class action.

11

162.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

12

fraud-on-the-market doctrine in that:

13

•      Defendants made public misrepresentations or failed to disclose material facts

14

during the Class Period;

15

•      the omissions and misrepresentations were material;

16

•      AcelRx securities are traded in an efficient market;

17

•      the Company's shares were liquid and traded with moderate to heavy volume

18

during the Class Period;

19

•      the Company traded on the NASDAQ and was covered by multiple analysts;

20

•      the misrepresentations and omissions alleged would tend to induce a reasonable

21

investor to misjudge the value of the Company's securities; and

22

•      Plaintiffs and members of the Class purchased, acquired and/or sold AcelRx

23

securities between the time the Defendants failed to disclose or misrepresented material facts

24

and the time the true facts were disclosed, without knowledge of the omitted or misrepresented

25

facts.

26

163.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to

27

a presumption of reliance upon the integrity of the market.

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

164.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

165.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

166.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

167.   Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

168.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of AcelRx, the Individual Defendants had knowledge of the details of AcelRx's internal affairs.

169.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of AcelRx.  As officers and/or directors of a publicly-held company, the Individual Defendants had

34

a duty to disseminate timely, accurate, and truthful information with respect to AcelRx's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of AcelRx securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning AcelRx's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired AcelRx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

170.    During the Class Period, AcelRx securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AcelRx securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of AcelRx securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of AcelRx securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

171.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

172.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Promulgated Thereunder Against All Defendants)

173.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

174.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period: (a) enhance sales of DSUVIA by marketing the same via the Misbranding Violations; (b) on the basis of that falsified marketing, to deceive investors into believing the prospects and addressable market for DSUVIA was larger than it actually was; and (c) thereby caused Plaintiffs and other members of the Class to purchase AcelRx stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants engaged in the unlawful acts as alleged herein.

175.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to falsely brand DSUVIA in its marketing and to exploit that misleading marketing to attract investors as specified herein.

176.    Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct, as alleged herein, in an effort to reassure investors that the Company was in compliance with its REMS program and that it was marketing DSUVIA safely and in compliance with laws and regulation.  As alleged more particularly herein, these acts included misbranding DSUVIA as a drug that was "TONGUE AND DONE" yet failing to present risk and warning information with prominence and readability reasonably comparable with the presentation of information relating to DSUVIA's benefits. Throughout the Class Period, Defendants made false or misleading representations to investors about the risks and efficacy of DSUVIA and failed to disclose that its marketing exposed AcelRx to the risk of regulatory

36

scrutiny.  These specific acts and the underlying violations of federal law rendered Defendants' Class Period statements materially misleading when made, and operated as a fraud and deceit upon the purchasers of AcelRx's common stock during the Class Period.

177.    As a result of the Defendants' fraudulent scheme and failure to disclose material facts, as set forth above, the market price for AcelRx securities was artificially inflated during the Class Period.

178.    In ignorance of the fact that market prices of AcelRx's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements disseminated by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired AcelRx's common stock during the Class Period at artificially high prices and were damaged thereby.

179.    At the time these misrepresentations and omissions were made as part of Defendants' fraudulent scheme, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding AcelRx, Plaintiffs and other members of the Class would not have purchased or otherwise acquired AcelRx common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

180.    As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

181.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

182.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

183.   During the Class Period, the Individual Defendants participated in the operation and management of AcelRx, and conducted and participated, directly and indirectly, in the conduct of AcelRx's business affairs.

184.   Because of their senior positions and interactions with the FDA concerning DSUVIA, they knew the adverse non-public information about AcelRx's misstatement of income and expenses and false financial statements.

185.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AcelRx's financial condition and results of operations, and to correct promptly any public statements issued by AcelRx which had become materially false or misleading.

186.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which AcelRx disseminated in the marketplace during the Class Period concerning AcelRx's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AcelRx to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AcelRx within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AcelRx securities.

187.   Each of the Individual Defendants, therefore, acted as a controlling person of AcelRx.  By reason of their senior management positions and/or being directors of AcelRx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, AcelRx to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of AcelRx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

188.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AcelRx.

### COUNT IV

**Violations of Section 20A of the Exchange Act Against the Individual Defendants**

**(Insider Trading)**

189.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

190.     This Claim is brought against the Individual Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

191.     On February 11, 2021, Defendant Angotti sold 23,052 shares of AcelRx stock at $2.63 per share, for a total of $60,626.76.

192.     On February 11, 2021, Defendant Asadorian sold 9,024 shares of AcelRx stock at $2.63 per share, for a total of $23,733.12.

193.     On February 11, 2021, Defendant Palmer sold 8,915 shares of AcelRx stock at $2.63 per share, for a total of $23,446.45.

194.     The Individual Defendants, through their respective positions as CEO, CFO, and CMO of AcelRx, had access to the material, non-public FDA warning letter prior to AcelRx's disclosure concerning same on February 16, 2021. By virtue of their receipt thereof, the Individual Defendants were duty bound not to benefit therefrom, a duty which the Individual Defendants violated by selling AcelRx shares at an inflated price.

195.     The measure of damages for trading while in possession of material non-public information under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, is the disgorgement of profits gained and losses avoided by such trading.

196.     By virtue of the foregoing, the Individual Defendants are liable for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

197.     This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

1

**PRAYER FOR RELIEF**

2

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

3

A.      Determining that the instant action may be maintained as a class action under

4

Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class

5

representatives;

6

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by

7

reason of the acts and transactions alleged herein;

8

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-

9

judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

10

D.      Awarding such other and further relief as this Court may deem just and proper.

11

**DEMAND FOR TRIAL BY JURY**

12

Plaintiffs hereby demand a trial by jury.

13

Dated:  March 7, 2022

14

15

Respectfully submitted,

16

**POMERANTZ LLP**

17

*/s/ Louis C. Ludwig*
_____

18

Joshua B. Silverman
Louis C. Ludwig, *Pro Hac Vice*

19

Brian P. O'Connell (SBN 314318)
10 South LaSalle Street

20

Chicago, Illinois 60603
Telephone: (312) 377-1181

21

Facsimile:  (312) 229-8811
jbsilverman@pomlaw.com

22

lcludwig@pomlaw.com

23

boconnell@pomlaw.com

24

Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**

25

1100 Glendon Avenue, 15th Floor

26

Los Angeles, California 90024
Telephone: (310) 405-7190

27

jpafiti@pomlaw.com

28

Jeremy A. Lieberman

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

J. Alexander Hood II
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Lead Counsel*

Robert V. Prongay
Casey E. Sadler
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

*Additional Counsel for Plaintiffs*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS