POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AARON SNEED JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACELRX PHARMACEUTICALS, INC., VINCENT J. ANGOTTI, and RAFFI ASADORIAN,<br><br>Defendants. | Case No. 5:21-cv-04353<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Beth Labson Freeman<br><br>Hon. Susan van Keulen<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Yaacov Musry and Aaron Sneed Jr., along with additional named Plaintiff David O'Grady (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' third amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AcelRx Pharmaceuticals, Inc.

1

("AcelRx" or the "Company"), analysts' reports and advisories about the Company, interviews with knowledgeable former employees of AcelRx, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AcelRx securities between March 20, 2019 and February 12, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its top officer.

2.     AcelRx is a specialty pharmaceutical company that focuses on the development and commercialization of therapies for the treatment of acute pain.

3.     During the Class Period, the unprofitable Company's lead product candidate was DSUVIA, a 30 mcg sufentanil sublingual tablet for the treatment of moderate-to-severe acute pain.

4.     On November 2, 2018, AcelRx announced that the U.S. Food and Drug Administration ("FDA") had approved DSUVIA for the management of acute pain in adults severe enough to require an opioid analgesic in certified medically supervised healthcare settings, such as hospitals, surgical centers, and emergency departments.

5.     Because of the potential for life-threatening respiratory depression (reduced or stopped breathing) due to accidental exposure, DSUVIA, an inherently high-risk opioid, was approved for marketing only through a restricted program called the DSUVIA Risk Evaluation and Mitigation Strategy ("REMS") program, which limits distribution to certified, medically supervised health care settings where health care professionals are trained in the proper use and administration of the product.  REMS are not distinct and severable from drug marketing; they

are an integral part of that process. REMS are negotiated and included in New Drug Applications ("NDAs") as preconditions that the FDA weighs when deciding whether to allow a sponsor to market a drug in the first instance. The FDA also required that the label contain a "black box" warning because of the drug's serious risks. According to *Drugwatch*, "A black box warning is the FDA's most stringent warning for drugs and medical devices on the market. Black box warnings, or boxed warnings, alert the public and health care providers to serious side effects, such as injury or death."[1]

6.      Downplaying or omitting REMS in promotional materials is unlawful and has historically triggered the issuance of FDA warning letters, making it a foreseeable consequence of such conduct.

7.      Having had their NDA for DSUVIA rejected once in 2017, and having ultimately achieved approval to market only with a stringent REMS and black box warning, Defendants were aware at all relevant times of the scrutiny that the FDA would apply to DSUVIA, as well as the ultimate responsibility that the Company bore for compliance with the DSUVIA REMS.

8.      As an FDA approved drug, DSUVIA is subject to the Federal Food, Drug, and Cosmetic Act ("FD&C Act"). The FD&C Act prohibits introducing or delivering for introduction into interstate commerce any misbranded drug.

9.      Nevertheless, in direct contravention of the FD&C Act, the Company developed and used a banner[2] advertisement and a tabletop display advertisement as promotional materials that were materially false and/or misleading and that misbranded DSUVIA.

10.     AcelRx falsely marketed DSUVIA in these advertisements as a one-step drug when it was not, with the misleading slogan "TONGUE AND DONE," which refers to DSUVIA's sublingual administration—*i.e.*, a tablet of DSUVIA is placed beneath the tongue to

---

[1] *See* https://www.drugwatch.com/fda/black-box-warnings/

[2] For purposes of this Third Amended Complaint, the term "banner" refers to an online advertisement.

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

dissolve.  The promotional materials gave greater status to the benefits of DSUVIA while relegating information regarding limitations of use and risks to significantly less prominent locations and employing typographical and layout techniques less apt to achieve emphasis of the limitations of use and risks of DSUVIA.  Marketing materials also touted that patients may retake the drug in one-hour intervals, a statement that omitted extremely important maximum dosage safety limitations in the label approved by the FDA (collectively, these practices constitute the "Misbranding Violations").

11.    Defendants deployed the deceptive materials at well-attended conferences and instructed sales personnel to use the slogans in conversations with doctors *up to a full year* before the Company ever submitted those materials to the FDA in December 2019.  *See* ¶¶19, 96-97, 99-100, 120, 136, 138, 144, 164, *infra*.

12.    Even after submitting the materials to the FDA, Defendants continued their use through mid-February 2021 (*see* ¶101, *infra*), despite not receiving any FDA feedback (*see* ¶139, *infra*), despite knowing the inherent risks of marketing DSUVIA with tag lines that ran directly counter to the REMS (*see* ¶¶43, 49, 51, 108, 139), and despite widespread internal disagreement with the use of the improper slogans. *See* ¶¶109, 114-116, 142-145, *infra*.

13.    AcelRx's false description of DSUVIA's administration was consistent with CEO Vincent J. Angotti ("Angotti")'s aim of expanding DSUVIA's market to include settings where monitoring was limited or non-existent, and therefore much more dangerous for the highly potent opioid. "Tongue and Done" served to make DSUVIA seem more marketable than it actually was, both to investors and to medical users.

14.    Defendants were therefore motivated to market DSUVIA beyond its permitted label.

15.    As knowledgeable former employees confirmed, AcelRx considered the prospect of an FDA warning letter from such aggressive marketing to be a known and acceptable risk. Defendants cavalierly disregarded this risk when they marketed DSUVIA in a manner disallowed by the REMS.

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.     Throughout the Class Period, Defendants never retracted, recalled, or repudiated their deceptive promotional materials, which they continued to use until mid-February 2021. To the contrary, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company engaged in the Misbranding Violations; (2) the Company was therefore subject to a foreseeable and increased risk of regulatory investigations or enforcement actions; and (3) the Company recklessly disregarded those risks. As a result, the Company's public statements were materially false and misleading throughout the Class Period.

17.     Defendants' unlawful "TONGUE AND DONE" claims were broadly disseminated on the internet, at regional medical conferences (including at an assembly with 2,300 emergency physician members), and a national medical conference that draws more than 15,000 attendees annually. Thus, Defendants undermined the DSUVIA REMS by oversimplifying the administration process and creating a misleading impression about the safe administration of DSUVIA to the doctors who would undertake that administration.

18.     At all relevant times, Defendants were well aware of the offending promotional materials at issue here, as evidenced by their signing of AcelRx's public filings and addressing analysts and investors about the Company's operations and activities. Defendant Angotti weighed in on most matters, including marketing materials, and had direct knowledge of the content later flagged by the FDA.

19.     Defendant Angotti attended a pain management conference in late 2018 or early 2019, where AcelRx used a "Tongue and Done" table drape and sales handouts. Defendant Angotti was also present at a meeting where an AcelRx regional medical director expressed concerns about these materials to high-level executives including Defendants Angotti and Pamela Palmer ("Palmer") – AcelRx's Chief Medical Officer ("CMO") – well before the FDA took any action against the Company.

20.     On February 16, 2021, AcelRx disclosed that, on February 11, 2021, the Company had received a warning letter from the FDA's Office of Prescription Drug Promotion ("OPDP") concerning promotional claims for DSUVIA. Previously, the OPDP had reviewed

1   and provided recommendations regarding the DSUVIA REMS.

2       21.    Specifically, having "reviewed an 'SDS Banner Ad' (banner) (PM-US-DSV-

3   0018) and a tabletop display (PM-US-DSV-0049) (display)," the FDA concluded that "[t]he

4   promotional communications, the banner and display, ***make false or misleading claims and***

5   ***representations about the risks and efficacy of DSUVIA***," and "[t]hus . . . misbrand Dsuvia

6   within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and make its

7   distribution violative."[3] The warning letter "request[ed] that AcelRx cease any violations of the

8   FD&C Act" and "submit a written response to th[e] letter within 15 days …."

9       22.    The FDA's warning letter was especially damning because it highlighted the

10   significance of Defendants' undermining of the DSUVIA REMS, a plan that had been revised

11   and resubmitted no less than four times by Defendants themselves, in their misbranding

12   violations.

13       23.    Defendants have never explained the temporal gap between the timing of their

14   receipt of the FDA warning letter on February 11, 2021 and their disclosure of that letter on

15   February 16, 2021.

16       24.    By February 16, 2021, Defendants had no choice but to admit their misconduct.

17   On that day, the FDA issued its own press release that expressly linked the Misbranding

18   Violations with the aims and purposes of the DSUVIA REMS.

19       25.    On this news, AcelRx's stock price fell $0.21 per share, or 8.37%, to close at

20   $2.30 per share on February 16, 2021.

21       26.    As a result of Defendants' wrongful acts and omissions, and the precipitous

22   decline in the market value of the Company's securities, Plaintiffs and other Class members have

23   suffered significant losses and damages.

24   <u>**JURISDICTION AND VENUE**</u>

25       27.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a)

26   

27     [3] Emphasis is added throughout, unless otherwise noted.

28   

6

of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

29.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  AcelRx is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

30.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

31.     Plaintiffs, as set forth in Certifications previously filed with the Court (ECF Nos. 21-2 & 28-5) acquired AcelRx securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

32.     Defendant AcelRx is a Delaware corporation with principal executive offices located at 25821 Industrial Boulevard, Suite 400, Hayward, California 94545.  The Company's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ACRX."

33.     Defendant Angotti has served as AcelRx's CEO at all relevant times.

34.     Defendant Palmer is an anesthesiologist and served as AcelRx's CMO at all relevant times.

35.     Defendants Angotti and Palmer are sometimes referred to herein as the "Individual Defendants."

36.     The Individual Defendants possessed the power and authority to control, and did control, the contents of AcelRx's SEC filings, press releases, and other market communications.

The Individual Defendants were privy to the Company's communications with the FDA, and were provided with copies of AcelRx's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

37.     AcelRx and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### AcelRx and DSUVIA

38.     AcelRx is a specialty pharmaceutical company that purports to focus on the development and commercialization of therapies for the treatment of acute pain. The Company's lead product candidate is DSUVIA, a 30 mcg sufentanil sublingual tablet for the treatment of moderate-to-severe acute pain. Throughout the Class Period, DSUVIA was the Company's only approved product in the United States.

39.     DSUVIA  is a potent opioid painkiller that is of particular use in certain special circumstances where adult patients may not be able to swallow oral medication and where access to intravenous pain relief is not possible.

40.     On December 12, 2016, AcelRx submitted to the FDA an NDA for DSUVIA which included a proposed REMS.

41.     REMS refers to "a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help

ensure the benefits of the medication outweigh its risks."[4] Specifically, "REMS are designed to reinforce medication use behaviors and actions that support the safe use of that medication. While all medications have labeling that informs health care stakeholders about medication risks, only a few medications require a REMS."[5]

42.     While the FDA specifies the requirements and approves the REMS, the drug manufacturer is responsible for developing and implementing the program.

43.     Pursuant to the Civil False Claims Act, 31 U.S.C. §3729, failure to comply with a REMS results in a misbranded drug, the promotion of which could result in causing the submission of a false claim.

44.     Drug manufacturers who downplay or omit REMS in their promotional materials or activities risk triggering adverse consequences from the FDA, including FDA warning letters. Accordingly, the impact of downplaying REMS in marketing materials was known and foreseeable.  For example:

a. In November 2008, Actelion Pharmaceuticals received a warning letter from the FDA over a flash card used by Actelion's sales representatives that, among other things, misleadingly omitted any mention of Traceleer's REMS.

b. In February 2009, Gilead Sciences, Inc. received a warning letter from the FDA citing "false or misleading" statements about the REMS for its pulmonary hypertension drug Letairis made by one of Gilead's representatives at a medical conference. According to the FDA's warning letter, the representative stated that "*[t]he [Letairis] risk management plan is only there because of the class. The FDA only issued this because of the class, but this is not that big of a deal*." The Gilead warning letter made national news as "a lesson about the internet … namely

---

[4] *See* Risk Evaluation and Mitigation Strategies | REMS, https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems (last accessed Sept. 2, 2023).

[5] *Id.*

that *everything on it lives forever*" because the offending statements came to the FDA's attention via an online recording of the conference.[6]

45.     AcelRx's decision to include a REMS in its NDA is an admission that AcelRx had actual knowledge of the serious risks associated with the use of DSUVIA outside of those strict guidelines, and the need to limit distribution to certified, medically supervised health care settings where health care professionals are trained in the proper use and administration of the product. Such settings include hospitals, surgical centers, and emergency departments that are certified consistent with the requirements outlined in the REMS.

46.     In the case of DSUVIA, AcelRx's initially proposed a REMS consisted of a Medication Guide, ETASU ["Elements to Assure Safe Use"], an implementation system, and a timetable for submission of assessments.

47.     On July 27, 2017, the FDA convened a REMS Oversight Committee ("ROC") meeting to discuss the REMS proposal for DSUVIA, during which the ROC agreed that a REMS with ETASU was necessary "to ensure the benefits outweigh the risks associated with Dsuvia use."

48.     A memorandum by the FDA's Division of Risk Management, dated September 21, 2017, highlighted the importance of DSUVIA's presentation: "[t]he proposed indication for Dsuvia is for use in a medically supervised setting and the proposed labeling contains a boxed warning to discontinue the use of Dsuvia prior to discharge and warning for the risk of addiction, abuse, and misuse."

49.     On October 11, 2017, the FDA sent AcelRx a Complete Response Letter (or "CRL") rejecting the DSUVIA NDA. The CRL found fault with, among other things,  the directions for use included in the proposed label submitted as part of the NDA. Once again, the significance of DSUVIA's presentation was communicated directly to AcelRx.

---

[6] Jim Edwards, *Moneywatch* - CBS News, GILEAD'S FDA WARNING LETTER CONTAINS LESSON ABOUT THE INTERNET (Mar. 6, 2009) (last accessed Sept. 2, 2023).

50. On May 3, 2018, AcelRx resubmitted its NDA for DSUVIA, which again included a proposed, updated REMS.

51. A September 12, 2018 FDA memorandum presenting an overview of the Anesthetic and Analgesic Drug Products Advisory Committee's meeting to discuss the resubmitted DSUVIA NDA mentions that AcelRx "modified the directions for use" of DSUVIA in order to address the concerns itemized in the October 11, 2017 CRL.

52. On October 9, 2018, the FDA and AcelRx representatives met via teleconference to discuss the REMS.

53. An FDA Advisory Committee Briefing Document dated October 12, 2018 explained that the Company would take responsibility for monitoring, auditing and ensuring compliance with the REMS for DSUVIA:

> ***AcelRx will be responsible for monitoring and auditing the entire DSUVIA supply chain from point of packaging through use by the certified healthcare facilities/services to ensure that all processes and procedures are in place and functioning to support the requirements of the DSUVIA REMS Program***. If non-compliance or DSUVIA use outside of a medically supervised setting is identified, corrective action, including immediate de-certification, will be instituted by AcelRx.

54. On October 17, 2018, the FDA provided preliminary comments to AcelRx concerning the REMS Document and REMS materials (Healthcare Setting Enrollment form and Website Screenshots) for DSUVIA.

55. On October 23, 2018, AcelRx submitted to the FDA an amended REMS that included comments on its REMS document, enrollment form and website screenshots.

56. The FDA's OPDP, which reviews prescription drug advertising and promotional labeling to ensure that the information contained in these promotional materials is not false or misleading, reviewed and provided comments on the proposed REMS materials for DSUVIA.

57. The FDA's overall review of the REMS specifically considered the OPDP's

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    recommendations thereto.

2         58.    On October 29, 2018, the FDA provided AcelRx with feedback on, among other

3    things, the website screenshots.

4         59.    On October 31, 2018, AcelRx submitted to the FDA a further amended REMS

5    that included the proposed revised REMS Document, enrollment form, and website screenshot.

6         60.    In the run-up to DSUVIA's approval decision, on October 31, 2018, Defendant

7    Palmer claimed that DSUVIA addressed an unmet need. Speaking to ABC News, she said,

8    "[r]ight now, if you broke your femur and went into an emergency room, you would either have

9    to be stuck with a needle or they would just give you an oral pill that you would swallow and

10   kind of wait for it to kick in, which could take up to an hour."

11        61.    Defendant Palmer told ABC News that DSUVIA could dissolve under the tongue

12   for patients, in contrast to other comparatively slow-acting opioids. She claimed this offered a

13   unique benefit previously restricted to cancer patients.

14        62.    The danger of DSUVIA was obvious to Defendants and medical professionals,

15   as it is five to ten times stronger than fentanyl and 500 to 1000 times more powerful than

16   morphine.  Acknowledging the threat to safety, Defendant Palmer assured the public that "[w]e

17   have much stricter audits and monitoring and controls where we will have oversight from our

18   manufacturers, from our distributors, wholesalers, all the way to the medically supervised

19   setting"; in short, AcelRx described DSUVIA's rollout as heavily supervised because of its

20   inherent danger.

21        63.    On November 1, 2018, a day after receiving further feedback from the FDA on

22   its proposed REMS, AcelRx submitted an amended REMS, demonstrating that the rapid

23   negotiation of that document was a priority for the Company and its senior management.

24        64.    On November 2, 2018, AcelRx announced that the FDA had approved DSUVIA

25   to be marketed in accordance with the fifth REMS submitted on November 1, 2018, but only for

26   use in certified medically supervised healthcare settings, such as hospitals, surgical centers, and

27   emergency departments.

28

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

65.     Despite the addition of a heavily negotiated REMS to address safety concerns, industry participants criticized the FDA for approving DSUVIA because of its risk profile, further putting the Company on notice that its flagship drug would be subject to opposition and scrutiny.

66.     Sidney Wolfe, founder and senior adviser of Public Citizen's Health Research Group, warned, on November 2, 2018, that DSUVIA was likely to cause many deaths due to its "unique harms."

67.     On November 5, 2018, Senator Ed Markey (D-Massachusetts) added that "[e]ven in the midst of the worst drug crisis our nation has ever seen, the FDA once again is going out of its way to approve a new super-charged painkiller that would only worsen the opioid epidemic. It makes no sense to approve an opioid painkiller that has no benefits over similar medications and against the advice of experts."

68.     Raeford Brown, M.D., the FDA's opioid advisory committee chair, warned against approval.  After the agency green-lit DSUVIA, Dr. Brown co-authored a November 16, 2018 column in *The Washington Post* saying the FDA made "made the wrong call." Along with the drug's inherent dangers, DSUVIA had "limited efficacy and no unique benefits," to recommend it, according to Dr. Brown.

69.     Around the same time, Senator Richard Blumenthal (D-Connecticut), appeared at a press conference with fire fighters and police officers, and warned that DSUVIA would inevitably move to street consumption, thereby worsening the national epidemic of opioid addiction.

70.     Well known problems with other opioid manufacturers also put Defendants on notice that DSUVIA's marketing would be heavily scrutinized.  For example, in 2019, at the same time the Company was engaged in DSUVIA-related misbranding violations, an Insys Therapeutics executive danced and rapped in a fentanyl spray bottle at a national sales conference, garnering widespread criticism.

71.     Nevertheless, enforcement actions by the FDA's  OPDP have remained low in

recent years, with only six warning and untitled letters sent to drugmakers in 2020. Since 2015, OPDP has sent fewer than ten untitled and warning letters in all but two years, 2019 and 2016.

**Defendants Approve of "Tongue and Done" in the Face of Obvious Risks**

**FE1**

72.     Former Employee ("FE") 1 worked as a contract marketing manager for AcelRx from June 2017 to March 2020 and as a marketing specialist from January 2016 to June 2017.

73.     FE1's supervisor was the Senior Director of Marketing (FE4, *infra*), who reported directly to Defendant Angotti.  FE1 explained that Angotti has a background in marketing and was involved in setting the commercialization strategy for DSUVIA.  FE1 and Senior Director of Marketing were the only personnel who made up AcelRx's two-person marketing team.  FE1 and the Senior Director of Marketing also enlisted outside agencies to create the DSUVIA launch campaign content.

74.     FE1 confirmed that AcelRx's only commercialized product at the time FE1 worked there was DSUVIA, and that everyone at the Company worked on it.

75.     FE1 managed agency and vendor relationships for AcelRx and developed content marketing materials, including brochures, training materials, videos, presentations, and websites.  FE1 conducted primary and secondary market research projects to help AcelRx adapt its DSUVIA marketing strategy before and after the launch.

76.     In addition, FE1 assessed the market landscape and reviewed the packaging design.

77.     FE1 said that DSUVIA's brand identity required regular sign-off from regulatory and compliance staff, because it required a REMS.

78.     FE1 stated that Marketing collaborated with the medical, legal, and regulatory ("MLR") departments via a Promotional Review Committee ("PRC"), a multi-disciplinary group that included representatives from MLR.  PRC members approved marketing content as FDA-compliant and were in direct communication with the FDA.

79.     FE1 managed all inputs and commercial needs for the MLR meeting of the PRC,

and was responsible for coordinating the group.

80.     FE1 assessed demand for DSUVIA and worked closely with the sales team on the launch strategy and execution for DSUVIA.

81.     FE1 ensured that the sales reps and conference booth staff had needed marketing materials and worked closely with the trade show manager to develop strategy, manage vendors, and run pre-conference meetings.

**FE2**

82.     FE2 served as a contract HR Consultant at AcelRx from June 2019 to August 2021. FE2 was based in Redwood City, California, and reported to management at Christine Mathews Consulting, where FE2 was a people operations/human resources coordinator and part of the consulting team.

83.     As a contract HR Consultant for AcelRx, FE2 worked for the Company during the launch of DSUVIA, helping as an outside consultant on staffing matters. There were multiple people in this role.

84.     FE2 explained that AcelRx was a small company, and only two people at corporate headquarters worked on marketing. The Senior Director of Marketing was responsible for all marketing functions, and had one direct report – FE1.

85.     FE2 understood that the Senior Director of Marketing (FE4, *infra*) reported to the CEO, Defendant Angotti, who has a background in sales and marketing.  Consistent with FE2's understanding, Defendant Angotti describes his former experience on LinkedIn as including a seven-year stint as Senior Vice President, Sales and Marketing at Reliant Pharmaceuticals from 2001-2008, and describes his education as including a Master of Business Administration in Business, Management, Marketing, and Related Support Services from Columbia University.

86.     FE2 stated that Angotti provided final approval and would have reviewed and signed off on marketing materials.

**FE3**

87.     FE3 served as a medical editor for Publicis Groupe ("Publicis") from March 2018

to September 2018.  Publicis' Health division worked with AcelRx on the marketing materials for DSUVIA, with the Senior Director of Marketing (FE4, *infra*) as the primary contact.

88.     FE3 confirmed that AcelRx relied on Publicis Groupe's Health division to hone its messaging and brand identity for DSUVIA, including editing in preparation for the FDA.

89.     FE3 worked at Publicis as AcelRx was preparing to launch DSUVIA, which was marketed to health care professionals in ambulatory surgical centers and hospitals.

90.     FE3 explained that the "Tongue and Done" phrase was designated as "creative messaging" and was not reviewed for ***adherence to FDA regulations***.

**FE4**

91.     FE4 served as Senior Director of Marketing at AcelRx from May 2017 to June 2022. FE4 worked out of the Company's Hayward, California headquarters, and reported directly to the CEO, Defendant Angotti.

92.     FE4 managed the two-person marketing team at AcelRx, with FE1 reporting to FE4. FE4 oversaw all branding campaigns, and worked with legal, regulatory and medical teams to obtain sign-off before this marketing campaign launched.

93.     FE4 confirmed that he personally created the "Tongue and Done" slogan on behalf of AcelRx.

94.     FE4 stated that Angotti was aware of the "Tongue and Done" slogan, both because FE4 and the PRC kept him apprised of the marketing campaign development, and because Angotti explicitly supported approval of "Tongue and Done" at the final stage of approval.

95.     FE4 relayed that Defendant Palmer; Chief Legal Officer, Chief Compliance Officer and Corporate Secretary John G. Saia; Executive Director, Medical Affairs Karen DiDonato, and Vice President Medical Affairs Gail Rosen Spahn ("Spahn") participated in PRC meetings where the slogan was considered and approved.  Defendant Palmer, along with the other AcelRx executives who participated in these meetings, were charged with ensuring regulatory compliance and/or interacting with FDA, see ¶78, *supra*, and therefore either had

actual knowledge that the "Tongue and Done" campaign violated the REMS, or recklessly ignored that it did.

96.    FE4 reported that AcelRx began using the slogan on a banner ad used in internet ads, as well as in a table drape display that the Company began using at regional medical conferences when the DSUVIA campaign launched in 2018.  For example, in July 2019 AcelRx used the table drape at the New York American College of Emergency Physicians ["New York ACEP"] Scientific Assembly – a state medical specialty society with approximately 2,300 emergency physician members – as part of a vendor booth.  The booth used at the well-attended New York ACEP event is shown at left below:



97.    According to FE4, AcelRx also used the "Tongue and Done" slogan in an exhibit kit for national conferences.

98.    The exhibit kit, which displayed the same problematic promotional content, as the table drape, was created by Circle, an Omnichannel guest experience agency that produces exhibit kits featuring brands' promotional content.

99.    On October 19, 2019, Circle tweeted the following from its @CircleOGX X

1    (then Twitter) account regarding the exhibit kit:



9    100.    FE4 revealed that the exhibit kit was used at Anesthesia 2019, a national
professional association conference held in Orlando, Florida, from October 19 to 23, 2019. The
American Society of Anesthesiologists (ASA) held the Anesthesia 2019 conference, which
occurs annually and draws more than 15,000 attendees. The exhibit kit remained in use at other
national conferences after October 2019.

101.    FE4 reported that AcelRx continued to use the "Tongue and Done" slogan until
the Company received the FDA warning letter in February 2021.

**FE5**

102.    FE5 served as an account manager for AcelRx from September 2018 to March
2020.  FE5 worked out of Chicago, Illinois, and reported to Regional Business Director Christy
Sweet ("Sweet").  FE5 was part of the salesforce responsible for launching the Company's
DSUVIA product.  FE5 said he was one of the first six people to join the Company and the first
sales representative hired to promote DSUVIA.  FE5 explained that he worked on customer
development, account planning, and analyzing each account's pharmacy and therapeutics
process.

103.    After DSUVIA's approval, FE5 participated in DSUVIA's launch.  FE5 stated
that he developed and executed a business strategy to help DSUVIA gain acceptance at teaching
hospitals, integrated delivery networks, community hospitals, and ambulatory surgery centers.
FE5 stated that he worked with Defendants Palmer and Angotti regularly.

104.    FE5 confirmed that the Senior Director of Marketing, FE4, created and oversaw

18

the "Tongue and Done" slogan, and that AcelRx only had a two-person marketing team.  FE5 explained that Defendant Angotti weighed in on most matters, including marketing materials.

105.    FE5 recalled seeing the "Tongue and Done" slogan used in medical conference materials, including at conference booths while promoting DSUVIA, including at conferences in Milwaukee, Wisconsin held in 2019 or early 2020.  An example of such a booth is shown below:



106.    FE5 also stated that Angotti was aware of the "Tongue and Done" slogan, and that Angotti attended medical conferences in which the Company used the "Tongue and Done" table drape.

107.    In addition, FE5 noted that Angotti and FE4 – AcelRx's Senior Director of Marketing – crossed paths many times throughout the day in the confines of AcelRx's small offices, where the two worked in close proximity.

108.    Based on 30 years' experience in the pharmaceutical sector – the same amount

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of industry experience held by Angotti – FE5 said that the FDA's reaction to "Tongue and Done" was predictable because (i) the industry is tightly-regulated and (ii) brief taglines like "Tongue and Done" carry an inherent risk of omitting required information.

109.   FE5 recalled speaking with numerous colleagues about the "Tongue and Done" slogan during the Class Period, and that all of these colleagues found the slogan to be inappropriate. As a result, they were uncomfortable with using it in their respective marketing activities.

**FE6**

110.   FE6 served as a federal account director for the Company from July 2019 to November 2021.  FE6 was based out of the Company's west region, working from Southern California.  FE6 reported to John Davis, who was in charge of federal account directors. John Davis reported to a Vice President, who reported to Angotti.  According to FE6, his sales accounted for 32% of total company revenues in Fiscal Years 2020 to 2021.

111.   FE6 said that the Company's PRC approved marketing messages, which were then sent to the FDA.  FE6 believes that Angotti would have been familiar with the "Tongue and Done" slogan, because AcelRx was a small company and DSUVIA was the Company's only approved product.

112.   FE6 explained that after AcelRx received the warning letter, FE6 was forced to inform AcelRx's customers that the Company would not be using the "Tongue and Done" slogan anymore.  FE6 stated that the FDA action negatively impacted the Company's reputation.

**FE7**

113.   FE7 served as a regional medical director for AcelRx between September 2018 and March 2019.  FE7 was a field-based medical affairs leader for a region that included Phoenix, AZ, and most of the Western U.S. and all military installations.  FE7 reported to Spahn.

114.   FE7 recalled the "Tongue and Done" slogan and reported that he expressed concerns to senior management about the slogan because it oversimplified the use of a powerful opioid and contained sexual overtones that could be misinterpreted. FE7 told senior management

that the Tongue and Done campaign was putting the company at risk of an FDA warning letter.

115.    FE7 brought those concerns to Defendants Angotti and Palmer, as well as Spahn, FE7's supervisor.  FE7 expressed those concerns in the Fall of 2018 to Defendant Palmer, who told FE7 that she appreciated FE7 bringing these concerns. That same day, at a strategy meeting at corporate headquarters, FE7 expressed these reservations to Defendants Angotti and Palmer, Spahn, the Senior Director of Marketing (FE4), Senior Vice President Sales and Commercial Strategy Paul Howe, and other key employees. Defendant Angotti responded that he put his trust in his marketing and sales team. FE7 said that Defendant Palmer was less supportive of FE7 at this strategy meeting than she had been in private; this time she told FE7 that the slogan was a marketing decision and that the medical affairs team should not get involved.

116.    Three months after the "Tongue and Done" campaign began, FE7 approached his supervisor, Spahn, and again expressed concerns that the Company was using the slogan.  Days later, Spahn summoned FE7 into her office and fired him.

117.    Spahn told FE7 he was fired because he was not supporting leadership decisions, and that Spahn did not feel confident in FE7 supporting an opioid product.

118.    FE7 said that Defendant Angotti attended events in which AcelRx prominently displayed the "Tongue and Done" slogan, and that the Company used the slogan at internal corporate meetings, national sales meetings, medical affairs meetings, and strategic development meetings. FE7 recalled Angotti attending a pain management conference in late 2018 or early 2019, where AcelRx used the "Tongue and Done" table drape and sales handouts.   FE7 confirmed that Defendant Angotti saw these materials in use at the event.

**FE8**

119.    FE8 worked as a hospital account director for AcelRx from September 2019 to March 2020, was based in Milwaukee, Wisconsin, and reported to Sweet.

120.    FE8 learned the "Tongue and Done" slogan in the course of training sessions to promote DSUVIA. Indeed, FE8 explained that the catchphrase featured prominently in sales training for hospital account managers when FE8 started work at AcelRx in May 2019

121.    FE8, who held a sales position, cannot recall any internal controls or processes set up by AcelRx to reduce the risks of negative consequences for the improper marketing of DSUVIA, even though providers were required to complete training and registration before ordering or administering DSUVIA.

122.    FE8 described AcelRx's approach to possible blowback over its marketing of DSUVIA as an acceptable risk.  According to FE8, AcelRx considered FDA warning letters to be a cost of doing business.

**FE9**

123.    FE9 worked as a regional director, scientific affairs for AcelRx from June 2019 to February 2020, and was based in in Pasadena, California.

124.    Corroborating FE8, FE9 attested to widespread awareness of the possibility of receiving FDA warning letters at AcelRx, which was matched by a reckless lack of concern about the fallout from such letters.

**FE10**

125.    FE10 served as a hospital account manager for AcelRx from March 2019 to September 2019.  FE10 worked in in Phoenix, Arizona, and reported to Southwest Regional Business Director Tracy Bray.

126.    As a hospital account manager for AcelRx, FE10 was responsible for commercially launching DSUVIA. FE10 was accountable for marketing DSUVIA to FE10's assigned hospital accounts. FE10 was part of the eight-person team of Southwest U.S. representatives selling DSUVIA.

127.    FE10 further states that he was the top AcelRx representative during the DSUVIA launch, and that the Southwest region was the national sales leader in 2019.

128.    FE10 had multiple call points, including existing accounts, operating rooms, hospitals, and surgery centers. FE10 called on C-suite hospital executives, pharmacy directors, emergency room directors, as well as Post-Anesthesia Care Unit and surgery center CFOs.

129.    FE10 stated that DSUVIA was a tricky product to get buy-in on from medical

users because it had a REMS requirement that, as FE8 clarified, created reciprocal obligations on providers.

130.     Angotti's solution to DSUVIA's difficulties, said FE10, was to continually expand DSUVIA's target market during the product launch. Angotti initially focused on hospitals and the battlefield, before deciding expanding to include ambulatory surgical centers and other questionable environments for such a potent and highly regulated opioid.

131.     FE10 knew that Angotti was heavily involved in the decision to extend DSUVIA's reach to ambulatory surgical centers because FE10 and his supervisor, Bray, worked closely with AcelRx senior executives to make strategy calls about market development.

132.     FE10 relayed that Angotti's primary motivation in oversimplifying DSUVIA's application was to expand DSUVIA's target market to include ambulatory surgical centers.  In this way, Angotti hoped to demonstrate a successful launch to the Company's venture capitalist investors.

133.     The problem with this strategy, FE10 noted, was that DSUVIA is intended for use in a medically supervised setting, while in some cases ambulatory surgical center patients leave the facility after their operation, making supervision impossible.  Thus, DSUVIA did not make sense in the ambulatory surgical center context.

**FE11**

134.     FE11 served as a hospital account manager for AcelRx from May 2019 to March 2020.  FE11 was based in Columbus, Ohio.

135.     As a hospital account manager for AcelRx, FE11 assisted with the launch of DSUVIA in the U.S. Midwest region. FE11 marketed DSUVIA to pharmacy directors at hospitals in a territory encompassing the Ohio cities of Columbus, Dayton, and Cincinnati. FE11 also called on anesthesia, emergency department, and intensive care clinicians working at hospitals, ambulatory, plastic, and oral surgery centers.

136.     FE11 said AcelRx selected him to represent the company at the 2019 ASA national meeting. There, as noted in ¶100, *supra*, AcelRx used the "'Tongue and Done' and

'DSUVIA® comes in one strength for acute pain'" language to promote DSUVIA.  FE11 shared his comprehensive knowledge of pain management with physicians who AcelRx hoped would one day use DSUVIA in their practice.

137.    FE11 states that he met and spoke with Angotti several times during the ASA national meeting.

138.    FE11 said that he was trained to use "Tongue and Done" language, which was prominently used in AcelRx's curriculum for hospital account managers when FE11 started work in May 2019, in his conversations with clinicians, and that the DSUVIA-related materials that AcelRx hospital account managers left with physicians included the phrasing.

139.    At the time of the ASA conference, FE11 was under the impression that "Tongue and Done" had already received approval from the OPDP.  FE11 stated taglines like "Tongue and Done" were generally subject to FDA approval prior to their being used, raising the likelihood that AcelRx deployed the "Tongue and Done" materials prematurely.

**FE12**

140.    FE12 served as a hospital account manager for AcelRx from May 2019 to March 2020.  FE12 was based in the field in the northeast and reported to Regional Business Director Albert Socha ("Socha").

141.    As a hospital account manager for AcelRx, FE12 launched DSUVIA in the Northeast U.S.  FE12 promoted the sublingual opioid analgesia to treat moderate to severe pain in hospitals and surgery centers, calling on ENT, Neuro, Ortho, and CT surgeons, as well as anesthesia providers.  FE12 developed and leveraged relationships with key clinician stakeholders who helped drive product adaptation and formulary approval.

142.    FE12 recalled that the "Tongue and Done" slogan was unusual to the point of being inappropriate, and most of the sales force was uncomfortable with it.

143.    In particular, the sales force believed the slogan, if interpreted literally, could encourage misuse or abuse of DSUVIA.

144.    In fact, FE12's own sales team would flip the tabletop display over at events so

that it would not be seen at all.

145.    FE12 voiced grievances to Socha. Socha did not dismiss FE12's concerns, and raised those concerns to the DSUVIA product manager, who would then be charged with determining whether to raise FE12's concerns to Angotti or other C-suite leaders.

146.    FE12 confirmed that both "Tongue and Done" and materials that used it were required to go through an internal compliance review before being approved for use.

### Defendants' Misbranding Violations

147.    The FD&C Act prohibits the introduction into interstate commerce any drug that is "misbranded." 21 U.S.C. § 331(a). Drugs are deemed "misbranded" if they have false or misleading labeling, or if the advertisements for the drug are false or misleading. 21 U.S.C. § 352(a)(1), (n); 21 C.F.R. 202.1(e)(5)(ii).

148.    In particular, drug advertisements violate the FD&C Act if they fail to present a fair balance between information relating to risks and harms of the drug and information relating to the effectiveness of the drug. 21 C.F.R. 202.1(e)(5)(ii).

149.    By law, determining whether drug advertisements are misleading requires assessing not only representations made or suggested by statements, words, designs, or any combination thereof, but also the extent to which the advertising fails to reveal facts material in light of such representations or material with respect to the consequences of using the advertised drug under customary and usual conditions of use or under the conditions of use prescribed in advertisements. 21 U.S.C. § 321(n).

150.    Starting in 2019, Defendants engaged in the Misbranding Violations by developing and using two promotional materials for DSUVIA, the banner and tabletop display, that made false and misleading claims and representations about the risks and efficacy of DSUVIA.

151.    AcelRx disseminated promotional communications that undermined key prescribing conditions required for the safe use of DSUVIA, which was approved for marketing only consistent with the specified REMS restrictions. The promotional communications at issue,

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

however, promote the product as simple to administer – just "**Tongue and Done."** The slogan "***TONGUE AND DONE***," falsely and dangerously implied that the administration of DSUVIA consisted of a simple, one-step process:



[Figure 1: Tabletop Ad]



[Figure 2: Banner Ad]

152.    As indicated by the product labeling mandated by the FDA as part of its approval, the administration of DSUVIA requires much more than plopping a tablet under the tongue. Specifically, a proper administration of the drug requires an initial, distinct step in which

26

sublingual administration of the DSUVIA tablet is visually confirmed. This additional step is important due to the serious safety concerns to the patient and others that arise from the potency and small size of the DSUVIA tablet.

153.    While AcelRx's banner and tabletop display included safety and risk information regarding DSUVIA, that information was minimized so that it was far less prominently displayed than the misleading statements that falsely touted the simple administration of DSUVIA. For instance, both promotional materials failed to present risk and warning information with prominence and readability reasonably comparable with the presentation of information relating to DSUVIA's benefits,

154.    The banner included additional false and misleading claims about the use of DSUVIA, including the following representations: (1) "Minimum redosing interval 1 hour," and (2) "Average redosing interval **3 hours*** . . . ***Shown** over a 12-hour period in the pivotal trial." The banner's reference to a minimum redosing interval of only 1 hour not only omitted, but undermined DSUVIA's maximum daily dosage as the FDA required its label to warn.  In particular, it did not say that patients were required not to "exceed 12 tablets in 24 hours," because doing so could be life-threatening.

155.    The banner also claimed that "DSUVIA® comes in one strength for acute pain." This statement makes representations about the medical indication and use of DSUVIA while failing to adequately convey material information regarding the drug's limitations of use, thereby resulting in a misleading impression about the drug.

156.    Additionally, while the banner contained some incomplete cautionary language, even that information was presented in a significantly less prominent fashion than information regarding DSUVIA's purported benefits.  Medical indication and risk information were obscured in a small font size on a white background and required the viewer to "scroll" down the banner to fully view the information, such as the statement in tiny print that "DSUVIA is for use only in a certified medically supervised healthcare setting." This unbalanced presentation contrasted with the banner's benefit claims, which were presented in an extremely large font on

a color background that required no scrolling to view.

157.    The banner and display created a misleading impression about the safe and effective use of DSUVIA, and therefore misbranded the drug and made its distribution a violation under the FD&C Act.

158.    The banner and display were flagrant violations of the DSUVIA REMS, and were especially risky given the warning of regulators that was aware that opioid REMS were being circumvented by deceptive marketing campaigns, just as Defendants did here.

159.    Specifically, a publicly-disseminated, September 2020 report by the Office of Inspector General for the Department of Health and Human Services , the cabinet department that includes the FDA, noted that the "challenges to ensuring that these REMS mitigate opioid misuse and abuse" included the fact that "[s]ome opioid manufacturers engaged in deceptive marketing practices that undermined the REMS' educational messages regarding risk."[7]  The report warned that opioid manufacturers exploited such campaigns "to increase prescribing."[8]

**Materially False and Misleading Statements Issued During the Class Period**

160.    The Class Period begins on March 20, 2019, when AcelRx presented at the Oppenheimer Health Care Conference. There, Defendant Angotti described for investors and analysts the addressable opportunity for DSUVIA paraphrasing the same language that ultimately resulted in the FDA warning letter:

> So, with the partnership for about the last nine years with the Department of Defense, out of that came DSUVIA, which is a single dose of 30 microgram sublingual sufentanil tablet. It is delivered in what's called an SPA. It might look like a syringe, but at one end it's actually a blunt tip. It's plastic and clear so you

---

[7] Suzanne Murrin, FDA'S RISK EVALUATION AND MITIGATION STRATEGIES: UNCERTAIN EFFECTIVENESS IN ADDRESSING THE OPIOID CRISIS, U.S. Department of Health and Human Services, Office of Inspector General, pp. 3, 23 (Sept. 2020).

[8] *Id.*

can actually see that the pill is in it. It's got a lock at the other end that prevents premature actuation or rejection of the pill. **You would simply remove the lock, tell the patient in the ER and post-op or the soldier [to] tilt their head back, lift up their tongue, you inject it under and you're done. And it's basically as simple as that.**

161.   The statements contained in ¶160 were false and/or materially misleading when made because they failed to disclose that: (1) "lift up their tongue, you inject it under and you're done. And it's basically as simple as that" created a misleading impression about the use of DSUVIA by omitting material information regarding dosing and administration; (2) by omitting material information regarding DSUVIA's limitations of use, Defendant Angotti created a misleading impression about the safe use of DSUVIA; (3) in so doing, Defendant Angotti undermined the REMS, which was intended to ensure the proper administration of, and reflect the serious risks associated with, DSUVIA; and (4) as a result, the Company was therefore subject to a foreseeable and increased risk of regulatory investigations or enforcement actions.

162.   During the Class Period, Defendants published and disseminated the tabletop and banner advertisements depicted in ¶151, *supra*, which were ultimately the subject of the FDA warning letter, to tens of thousands of physicians and medical personnel at numerous conferences, in publications and at trade shows.

163.   The statements contained and/or referred to in ¶¶151 & 162 were false and/or materially misleading when made because they failed to disclose that: (1) "tongue and done" created a misleading impression about the use of DSUVIA by omitting material information regarding dosing and administration; (2) by omitting material information regarding DSUVIA's limitations of use, Defendants created a misleading impression about the safe use of DSUVIA; and (3) as a result, the Company was therefore subject to a foreseeable and increased risk of regulatory investigations or enforcement actions.

## The Truth Emerges

164.   On February 16, 2021, AcelRx filed a current report on Form 8-K with the SEC,

disclosing that, on February 11, 2021, AcelRx received a warning letter from the FDA concerning the Misbranding Violations involving DSUVIA.   Specifically, the Form 8-K disclosed, in relevant part:

> On February 11, 2021, AcelRx . . . received a warning letter from **the Office of Prescription Drug Promotion ("OPDP")** of the [FDA] (the "Letter") relating to a banner advertisement the Company submitted to the OPDP on December 6, 2019 (the "Banner Ad"),  and a tabletop display the Company submitted on February 28, 2020, and resubmitted to the OPDP at its request on September 23, 2020 (the "Tabletop Display," and together with the Banner Ad, the "Promotional Material"). The Company submitted the materials to the OPDP pursuant to the FDA requirement that sponsors submit all promotional materials to the FDA at the time of their initial dissemination or publication. **The FDA's concerns identified in the Letter include its view that the Promotional Material makes misleading claims and representations about the risks and efficacy of DSUVIA® because the Promotional Material does not reveal facts that are material in light of the representations made . . . .**

165.    AcelRx went on to state that "[t]he Company intends to respond to the FDA within the timeframe requested in the Letter and seek guidance and clarification from the FDA on the concerns raised in the Letter."  Nevertheless, the nature and impact of any such response remains unknown.

166.    And while AcelRx claimed to have discontinued use of the offending materials, it qualified this by stating that "[t]he Company cannot give any assurances, however, that the FDA will be satisfied with its response to the Letter or that such response will resolve the issues identified in the Letter."

167.    The FDA warning letter, which was also publicly released on February 16, 2021 and which is attached hereto in full as <u>Exhibit 1</u>, advised that the agency "has reviewed an 'SDS Banner Ad' (banner) (PM-US-DSV-0018) and a tabletop display (PM-US-DSV-0049) (display)

for DSUVIA (sufentanil) sublingual tablet, CII (Dsuvia) submitted by AcelRx," and that **"[t]he promotional communications, the banner and display, make false or misleading claims and representations about the risks and efficacy of DSUVIA,"** which **"misbrand Dsuvia within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and make its distribution violative."**

168.   Specifically, the FDA warning letter noted the following deficiency with respect to the banner and tabletop display at issue: "The banner includes the claim, 'DSUVIA® comes in one strength for acute pain. . . **TONGUE AND DONE.'** (bolded emphasis original; reference omitted) in conjunction with an image of the single-dose applicator device. Similarly, the display prominently includes the claim **'TONGUE AND DONE'** (bolded emphasis original)."   The FDA found that **"[t]hese presentations are misleading because they imply that the administration of Dsuvia consists of a simple, one-step process, when this is not the case,"** and that, "[i]n fact, there are numerous administration steps outlined in the PI [the FDA-approved product labeling], including a separate, distinct step to visually confirm tablet placement in the patient's sublingual space of the mouth."

169.   The FDA went on to explain the Misbranding Violations were directly intertwined with the REMS <u>and</u> 2017 CRL:

> **The multiple steps involved in the administration of Dsuvia reflect the complexity of use of Dsuvia. Given the potency and the small size of the tablet, the risk of misplaced tablets is a serious safety concern to the patient and others. Risks include overdose and death due to accidental ingestion or exposure, improper dosing (i.e., over- or under-dosing and their associated risks), and the risk of diversion and its associated public health consequences.** This is critical information for healthcare providers to know. Therefore, by oversimplifying the administration process, these presentations create a misleading impression about the safe administration of Dsuvia. **These presentations are particularly concerning considering a REMS program was required for**

**Dsuvia to ensure that the benefits of the drug outweigh the risk of respiratory depression that can result from accidental exposure**.

170.    The FDA warning letter further advised that the banner at issue was deficient for stating "Minimum redosing interval **1 hour**" and "Average redosing interval **3 hours\*…** \*Shown over a 12-hour period in the pivotal trial" (emphases and alteration in original), because they **"create a misleading impression about the use of Dsuvia"** by **"omit[ting] . . . material information from the DOSING AND ADMINISTRATION section of the PI."**  Specifically, the banner should have included the words "Do not exceed 12 tablets in 24 hours" because, **"[b]y omitting this material information about the maximum daily dosage, the banner creates a misleading impression about the safe use of Dsuvia."**  The FDA noted that **"[t]hese omissions are concerning from a public health perspective due to the serious risks associated with overdose with Dsuvia, including respiratory depression and death, that should be considered when prescribing the product."**

171.    Additionally, the FDA warning letter took issue with the banner's claim that "DSUVIA® comes in one strength for acute pain" because **"the banner makes representations about the indication and use of the drug but fails to adequately convey material information regarding Dsuvia's limitations of use, thereby creating a misleading impression about the drug."**

172.    The FDA warning letter also found that, "**unlike the benefit claims in the banner, which utilized a color background and large font, the full indication with the limitations of use are intermingled with risk information in a paragraph format in a much smaller font size and a plain white background**," which were only accessible to viewers by scrolling down the banner and, therefore, did "not mitigate the misleading impression."

173.    The FDA warning letter further noted that the banner and tabletop display at issue "**fail[s] to present information relating to the Boxed Warning, Contraindications, Warnings and Precautions, and Adverse Reactions for Dsuvia with a prominence and readability reasonably comparable with the presentation of information relating to the**

**benefits of Dsuvia**." The FDA warning letter found that "benefit claims for Dsuvia are presented in conjunction with colorful graphics and large bolded headlines, with significant white space," whereas "the risk information is relegated farther down in paragraph format with less prominence." The FDA therefore concluded that, "[b]y failing to adequately present the risks and benefits associated with Dsuvia, the banner and display create a misleading impression about the safe and effective use of the drug."

174.   Finally, the FDA warning letter "request[ed] that AcelRx cease any violations of the FD&C Act" and "submit a written response to th[e] letter within 15 days from the date of receipt."

175.   Also on February 16, 2021, the same day that the FDA released the warning letter, it issued a press release entitled "*FDA issues warning to AcelRx for making false and misleading claims about the risks and benefits of Dsuvia*".[9]

176.   The FDA's press release opens by linking the Misbranding Violations to the administration of DSUVIA, a core function of the REMS (stating that the Misbranding Violations "**undermine key prescribing conditions required for [ ] safe use**"). Then, the press release explains the nexus between the REMS, which aimed to "**reflect[] the serious risks associated with [DSUVIA]**," – and the Misbranding Violations, which "**severely detract[ed] from**" and "**minimiz[ed]**" those same risks. Finally, the FDA emphasized the existential importance of AcelRx's discontinuation of these materials by giving the Company the choice between doing so and "**ceasing distribution of Dsuvia**."

177.   The FDA press release emphasized that the Misbranding Violations "dangerously undercut[]" the administration restrictions specified in the black box label and REMS, explaining:

***AcelRx has disseminated promotional communications that undermine key***

---

[9] *See* https://www.fda.gov/drugs/drug-safety-and-availability/fda-issues-warning-acelrx-making-false-and-misleading-claims-about-risks-and-benefits-dsuvia (last accessed Sept. 2, 2023).

***prescribing conditions required for the safe use of this opioid product***. Dsuvia was approved with special restrictions requiring that it only be prescribed in a certified medically supervised setting by health care practitioners trained to properly administer it. The promotional communications at issue, however, promote the product as simple to administer -- just "Tongue and Done." ***This promotion dangerously undercuts FDA-required conditions on the proper administration of the drug, which requires particular diligence to minimize the risk of serious or even fatal adverse events***.

Dsuvia is indicated for the management of acute pain in adults that is severe enough to require an opioid analgesic and for which alternative treatments are inadequate. It is of particular use in certain special circumstances where adult patients may not be able to swallow oral medication and where access to intravenous pain relief is not possible.

***Dsuvia was approved with a Risk Evaluation and Mitigation Strategy (REMS), which reflects the serious risks associated with this product. The REMS limits distribution to certified, medically-supervised health care settings where health care professionals are trained in the proper use and administration of the product.*** Such settings include hospitals, surgical centers and emergency departments that are certified in the requirements outlined in the REMS. The FDA continues to carefully monitor the implementation of the REMS associated with Dsuvia and compliance with its requirements.

***Critical conditions for the safe use of Dsuvia are not appropriately conveyed in the promotional communications cited in the warning letter***. ***In particular, the claim "Tongue and Done" severely detracts from these important conditions for safe use.*** Because of the potency and the small size of the tablet, the prescribing information outlines multiple administration steps including a separate, distinct step

34

to visually confirm tablet placement in the patient's mouth. These prescribed steps are designed to minimize the serious risk that misplaced tablets could cause to patients and others. ***The promotional communications at issue also omit other important risk information, further minimizing the serious risks associated with Dsuvia.*** For example, the materials state that patients may retake the drug in one-hour intervals but fail to state that the maximum daily dosage is 12 tablets in 24 hours. ***This omission is concerning due to the serious risks associated with overdose of Dsuvia, including respiratory depression and death.***

It is vitally important that promotional communications be truthful and non-misleading. Opioid products are highly addictive controlled substances and there are serious public health risks associated with their use, including addiction, abuse, and misuse, that can lead to overdose and death. ***False and misleading claims can negatively impact prescriber awareness and understanding about approved opioid drugs, their risks, and the actions and precautions necessary for the safe use of these products.***

****

The FDA remains focused on reducing the rate of new addictions by decreasing exposure to opioids while still enabling appropriate access for those patients who have legitimate medical need for these medicines. ***Dsuvia, when used in a manner consistent with the FDA-approved labeling, including the REMS,*** can play an important role in the management of pain. The agency will continue to actively confront the opioid crisis, while also paying careful attention to the needs of patients experiencing pain and their health care providers.

178.   On news of the FDA's warning letter, AcelRx's stock price fell $0.21 per share, or 8.37%, to close at $2.30 per share on February 16, 2021.

179.   An analyst report by Cantor Fitzgerald dated February 16, 2021 acknowledged

35

that the FDA warning letter "is not a complete shock to us, **the FDA has paid significant attention to the instructions for use for Dsuvia, even as far back as 2017**." And while a few analysts were skeptical of the importance of the warning letter, such skepticism was explicitly predicated on their acceptance of AcelRx's false statement that it had not used the "Tongue and Done" banner or table drape since late 2019.

180.    Between the time that Defendants admit they first received the FDA warning letter on February 11, 2021 and their disclosure of same to the market on February 16, 2021, 6,973,000 shares of AcelRx traded, with a dollar value of over $18 million. Defendants have never explained why they delayed informing investors of the letter for several days after receipt.

181.    Further, a former employee and Defendants' own admissions thoroughly refute Defendants' initial (and false) claim to have only used the banner and tabletop display in 2019. As alleged at ¶101, *supra*, FE4 (who created the "Tongue and Done" concept) confirmed that Defendants  continued to use the "Tongue and Done" slogan until mid-February 2021. In addition, Defendants themselves acknowledged, in the annual report filed on Form 10-K with the SEC on March 15, 2021, that they submitted the banner advertisement for FDA review in the final 3 weeks of 2019 and published or disseminated it on that date or thereafter, and that they disseminated the tabletop display on or after February 28, 2020:

>   *[O]n February 11, 2021, we received a warning letter from the Office of Prescription Drug Promotion, or OPDP, of the FDA relating to a banner advertisement we submitted to the OPDP on December 6, 2019 and a tabletop display we submitted on February 28, 2020, and resubmitted to the OPDP at its request on September 23, 2020. We submitted the materials to the OPDP pursuant to the FDA requirement that sponsors submit all promotional materials to the FDA at the time of their initial dissemination or publication.*

182.    On July 28, 2022, AcelRx filed a current report on Form 8-K with the SEC, revealing that the Company had to do a reverse stock split just to meet the NASDAQ's $1.00 minimum bid requirement. The stock has lost over 90% of its value since the warning letter.

1

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

2

183.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

3

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

4

otherwise acquired AcelRx securities during the Class Period (the "Class"); and were damaged

5

upon the revelation of the alleged corrective disclosures.  Excluded from the Class are

6

Defendants herein, the officers and directors of the Company, at all relevant times, members of

7

their immediate families and their legal representatives, heirs, successors or assigns and any

8

entity in which Defendants have or had a controlling interest.

9

184.    The members of the Class are so numerous that joinder of all members is

10

impracticable.  Throughout the Class Period, AcelRx securities were actively traded on the

11

NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

12

can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

13

or thousands of members in the proposed Class.  Record owners and other members of the Class

14

may be identified from records maintained by AcelRx or its transfer agent and may be notified

15

of the pendency of this action by mail, using the form of notice similar to that customarily used

16

in securities class actions.

17

185.    Plaintiffs' claims are typical of the claims of the members of the Class as all

18

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

19

federal law that is complained of herein.

20

186.    Plaintiffs will fairly and adequately protect the interests of the members of the

21

Class and has retained counsel competent and experienced in class and securities litigation.

22

Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

23

187.    Common questions of law and fact exist as to all members of the Class and

24

predominate over any questions solely affecting individual members of the Class.  Among the

25

questions of law and fact common to the Class are:

26

•       whether the federal securities laws were violated by Defendants' acts as alleged

27

herein;

28

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

• whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AcelRx;

• whether the prices of AcelRx securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

• whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

188.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

189.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

• Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

• the omissions and misrepresentations were material;

• AcelRx securities are traded in an efficient market;

• the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

• the Company traded on the NASDAQ and was covered by multiple analysts;

• the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

• Plaintiffs and members of the Class purchased, acquired and/or sold AcelRx securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

190.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

191.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

192.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

193.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

194.     Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

195.     As the senior managers and/or directors of AcelRx, the Individual Defendants had knowledge of the details of AcelRx's internal affairs. For example:

- Defendant Angotti personally attended Company events at which "Tongue and Done" materials were used.  *See* ¶¶19, 106, 118, 137, *supra*.

- The Individual Defendants heard internally-voiced concerns about these materials

39

long before the FDA took action against AcelRx.  *See* ¶115, *supra*.

- The Individual Defendants were privy to additional grievances about "Tongue and Done." *See* ¶¶109, 145, *supra*.

- Defendant Angotti, who boasted a background in marketing, was involved in setting the commercialization strategy for DSUVIA.  *See* ¶¶85-86, *supra*.

- Defendant Angotti reviewed and approved marketing materials for DSUVIA.  *See* ¶¶73, 86, 94, *supra*.

- The Individual Defendants oversaw a small company with a single FDA-approved product (DSUVIA).  *See* ¶38, 74, *supra*.

- Defendant Palmer sat on the PRC where the "Tongue and Done" slogan was considered and ultimately approved.  *See* ¶95, *supra*.

- The Individual Defendants were specifically told by a senior medical director that the Tongue and Done campaign was putting the company at risk of an FDA warning letter.  *See* ¶114, *supra*.

196.    Additional information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

197.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of AcelRx.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to AcelRx's businesses, operations, and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of AcelRx securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning AcelRx's business which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired AcelRx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the

securities and/or upon statements disseminated by Defendants, and were damaged thereby.

198.    During the Class Period, AcelRx securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AcelRx securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of AcelRx securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of AcelRx securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

199.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

200.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresentations to the investing public

## <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

201.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

202.    During the Class Period, the Individual Defendants participated in the operation and management of AcelRx, and conducted and participated, directly and indirectly, in the conduct of AcelRx's business affairs.

203.    As enumerated in ¶195, *supra*, the Individual Defendants, by virtue of their senior positions and interactions with the FDA concerning DSUVIA, knew the adverse non-public information underlying the FDA warning letter.

204.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AcelRx's operations, and to correct promptly any public statements issued by AcelRx which had become materially false or misleading.

205.    Because of their positions of control and authority as CEO and CMO of AcelRx, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which AcelRx disseminated in the marketplace during the Class Period concerning AcelRx's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AcelRx to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AcelRx within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AcelRx securities.

206.    Each of the Individual Defendants, therefore, acted as a controlling person of AcelRx.  By reason of their senior management positions and/or being directors of AcelRx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, AcelRx to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of AcelRx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

207.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AcelRx.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated:  September 5, 2023

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Louis C. Ludwig*

Joshua B. Silverman
Louis C. Ludwig, *Pro Hac Vice*
Brian P. O'Connell (SBN 314318)
10 South LaSalle Street
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 229-8811
jbsilverman@pomlaw.com
lcludwig@pomlaw.com
boconnell@pomlaw.com

Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
**POMERANTZ LLP**
600 Third Avenue, 20th Floor

43

New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

***Lead Counsel***

Robert V. Prongay
Casey E. Sadler
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

***Additional Counsel for Plaintiffs***

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## GLOSSARY OF RELEVANT TERMS

2

ACEP – American College of Emergency Physicians

3

ASA – American Society of Anesthesiologists

4

ETASU – [FDA] Elements to Assure Safe Use

5

FD&C Act – Federal Food, Drug, and Cosmetic Act

6

FDA – U.S. Food and Drug Administration

7

FE – Former Employee

8

MLR – Medical, Legal, and Regulatory[AcelRx]

9

NDA – [FDA] New Drug Application

10

OPDP – [FDA] Office of Prescription Drug Promotion

11

PRC – [AcelRx] Promotional Review Committee

12

REMS – [FDA] Risk Evaluation and Mitigation Strategy

13

ROC – [FDA] REMS Oversight Committee

14

SEC – U.S. Securities and Exchange Commission

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS